

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>)<br>RICHARD FLEMING )<br>)<br>Defendant. ) | 4:07CR 3005<br><br>**INDICTMENT**<br>(18 U.S.C. §§ 1341,<br>1343, 1347, and 2) |

The Grand Jury charges:

## INTRODUCTION

At all times material to this Indictment:

### A. Medicare, Medicaid, and Blue Cross Blue Shield of Nebraska

1. The Medicare Program (Medicare) was a federal health insurance program for people aged 65 and older and some persons under 65 who were blind and/or disabled. Medicare is codified under Title XVIII of the Social Security Act (42 U.S.C. § 1395, et seq.). Medicare was administered by the Centers for Medicare and Medicaid Services (CMS), formerly known as the Health Care Financing Administration (HCFA), an agency of the U.S. Department of Health and Human Services (HHS). Individuals who received benefits under Medicare were often referred to as Medicare "beneficiaries."

2. Section 24(b) of Title 18, United States Code, defined a "health care benefit

program" as "any public or private plan or contract, affecting commerce, under which any medical benefit, item or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item or service for which payment may be made under the plan or contract." Health Care Benefit Programs (hereinafter "Programs") include Medicare, Medicaid, and private insurers.

3. Medicare coverage was limited to services that were medically "reasonable and necessary" for the diagnosis or treatment of an illness (42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k)(1)).

4. HHS/CMS contracted with private insurers to administer the claims processing for Medicare Part B, which was the part of the program that handled doctor and other medical provider visits. These private insurer entities were known as "carriers". The function of carriers was to make payments for reasonable and necessary medical services from federal funds allocated for that purpose. At all times relevant to this indictment, Blue Cross/Blue Shield of Kansas, (BCBSKS), located in Topeka, Kansas, was the Medicare carrier and was responsible for receiving, processing, administering and paying claims submitted to Medicare for services provided by physicians in the State of Nebraska, including RICHARD FLEMING (FLEMING).

5. Medicare would reimburse a physician for reasonable and necessary medical services based on a fee schedule. Physicians would submit a claim form to the carrier for payment as services were provided. These claim forms, known as HCFA 1500 claim forms, would report the number and kind of services performed by the physician based on codes from the Current Procedural Terminology (CPT) manual published by the American Medical Association. The carrier made

payments on behalf of HHS/CMS, using federal funds from the Medicare Trust Fund, to the provider on behalf of the physician listed on the claim forms.

6. Physicians (providers) may have been "participating" Medicare physicians. This means that the physician entered into an agreement with the Medicare program agreeing to accept what the Medicare program allowed as reimbursement for services. Payment on such claims was then made directly to the physician. In the case of participating physicians, the contract prohibited them from collecting any money from any source above the amount allowed by Medicare rules for their services.

7. Medicare claims would be submitted to the Medicare carrier either in paper form or in electronic format. Submission of paper claims was accomplished using the United States Postal Service. Submission of electronic claims was accomplished using wire communication through computer modem connections. At all times relevant to this indictment, claims submitted by FLEMING to Medicare through BCBSKS were in paper format mailed from Omaha, Nebraska, to BCBSKS in Topeka, Kansas. Reimbursement for these claims was made by a paper check which was sent by United States Postal Service from BCBSKS in Topeka, Kansas to FLEMING's office in Omaha, Nebraska.

8. The **Medicaid** program was a health care benefit program designed primarily for the indigent. In Nebraska, the Medicaid program was funded with a combination of federal and state funds, with approximately 60% of the total financial burden of the program paid through the United States Department of Health & Human Services, and the remaining 40% by the State of Nebraska. Many patients who were disabled were eligible for both Medicare and Medicaid. In such cases, a HCFA 1500 claim form was sent to Medicare, and after Medicare paid its amount, the claim would

3

be electronically sent to Medicaid for review and further reimbursement (up to the amount allowed under Medicare rules). Medicaid would then pay any additional allowed amount due to the provider via a paper check through the United States Postal Service. Although many disabled patients were eligible for both Medicare and Medicaid, some were just eligible for Medicaid. If a patient was eligible for just Medicaid, claims were sent via the United States Postal Service from the physician to the Nebraska Medicaid office in Lincoln, Nebraska, and after Medicaid reviewed the claims for reimbursement, a paper check was issued and mailed through the United States Postal Service to the physician.

9. **Blue Cross Blue Shield of Nebraska** (BCBSNE) was a privately funded health care benefit program located in the State of Nebraska. BCBSNE claims would be submitted to the BCBSNE office in Omaha, Nebraska either in paper form or in electronic format. Submission of paper claims was accomplished using the United States Postal Service. Submission of electronic claims was accomplished using wire communication through computer modem connections. At all times relevant to this indictment, reimbursement to FLEMING was made by a paper check which was sent by United States Postal Service from BCBSNE in Omaha, Nebraska to FLEMING'S office in Omaha, Nebraska.

## B. Richard Fleming and Myocardial Perfusion Imaging

10. **RICHARD FLEMING** was a physician who practiced medicine in Nebraska. FLEMING was the president of, and sole physician employed at, Fleming Heart and Health Institute, P.C., (FHHI), in Omaha, Nebraska. FLEMING performed various diagnostic procedures as part of his practice, including myocardial perfusion imaging. FLEMING would submit or cause to be submitted HCFA

4

1500 claim forms in his corporate name, FHHI. Some healthcare benefit programs wrote checks to FHHI for FLEMING's claimed services, while other programs wrote checks directly to FLEMING.

11. **Myocardial Perfusion Imaging** is a diagnostic procedure used by physicians which can be performed in different ways. A specialized camera, along with a radioactive pharmaceutical, are used to take images of the heart. These images can be either planar (single image) or tomographic (multiple images from different angles), and the heart can either be at rest or under stress. The heart can be placed under stress through exercise or the use of certain drugs.

12. When a physician performed myocardial perfusion imaging studies, he or she submitted claims based on the number and types of studies performed. The CPT manual contained codes that delineated the number and types of imaging studies required to bill for each billing code. The CPT manual designated certain billing codes for tomographic myocardial perfusion imaging, including 78464 and 78465. Medicare, Medicaid, BCBSNE, and other health care benefit programs paid physicians more for CPT 78465 than for CPT 78464.

## COUNTS 1-10
## HEALTH CARE FRAUD

13. Paragraphs 1 through 12 of this Indictment are realleged and incorporated as if set forth fully herein.

14. From on or about January 24, 2002, until on or about October 9, 2002, in the District of Nebraska, defendant, RICHARD FLEMING did knowingly and willfully devise and intend to devise, execute and attempt to execute, a scheme and artifice to defraud a health care benefit program, and to obtain, by means of materially false and fraudulent pretenses, representations, and omissions of

material fact, money and property owned by, or under the control of a health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services.

15. In furtherance of the scheme and artifice, FLEMING submitted, and caused to be submitted, claims to Medicare, Medicaid, Blue Cross Blue Shield of Nebraska (BCBSNE), and other health care benefit programs, for tomographic myocardial perfusion imaging studies that FLEMING knew contained materially false and fraudulent pretenses and representations, and omissions of material fact, in that the claims presented to Medicare, Medicaid, BCBSNE, and other health care benefit programs, sought payment for tomographic myocardial perfusion imaging studies which had not been provided as stated on the claim forms. During the course of the scheme and artifice, these claims totaled approximately $130,380.

16. In furtherance of the scheme and artifice, FLEMING instructed his billing clerk to bill Medicare, Medicaid, BCBSNE, and other health care benefit programs for CPT code 78465, designating multiple tomographic imaging studies, when in fact, FLEMING knew that the claims submitted contained materially false and fraudulent pretenses and representations, and omissions of material fact, regarding the actual number and types of tomographic studies provided.

17. On or about the dates set forth below in the "Date Claim Submitted" column, in the District of Nebraska, FLEMING knowingly executed and attempted to execute the scheme and artifice to defraud health care benefit programs in connection with the delivery of and payment for health care benefits, items and services, as set forth above, by FLEMING submitting and causing to be submitted, to the authorized agents and intermediaries for Medicare, Medicaid, and BCBSNE, claim forms for payment of tomographic imaging studies which the defendant knew contained

materially false and fraudulent information regarding the quantity and type of imaging studies actually performed.

| Count | Date Claim Submitted | Patient | Date of Service | Health Care Benefit Program Billed |
|---|---|---|---|---|
| 1 | 03/08/02 | CG | 03/07/02 | BCBSNE |
| 2 | 03/18/02 | DW | 03/13/02 | Medicare & BCBSNE |
| 3 | 05/21/02 | DR | 05/21/02 | BCBSNE |
| 4 | 05/30/02 | NT | 05/29/02 | Medicare & Medicaid |
| 5 | 06/17/02 | JS | 06/14/02 | Medicare & BCBSNE |
| 6 | 08/16/02 | SW | 08/15/02 | Medicare & Medicaid |
| 7 | 09/12/02 | DE | 09/12/02 | Medicare & BCBSNE |
| 8 | 09/16/02 | SE | 09/16/02 | Medicare & BCBSNE |
| 9 | 09/18/02 | CM | 09/17/02 | Medicare & Medicaid |
| 10 | 10/04/02 | KM | 10/04/02 | BCBSNE |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNTS 11-12
## WIRE FRAUD

18. Paragraph 10 is realleged and incorporated as if set forth fully herein.

19. Dr. T. was a physician and was the CEO of Physicians Pharmaceutical, Inc., (hereafter PPI), a business located in North Carolina. Dr. T. / PPI desired to market a soy chip food product, and to make certain health claims, such as weight loss, in connection with the marketing of the soy chips. Accordingly, Dr. T. / PPI entered into an agreement with FLEMING to conduct a clinical study of the soy chip and to document health benefits, including weight loss.

7

Between on or about October 1, 2003, and December 2, 2003, Dr. T. / PPI paid FLEMING approximately $35,000 for the purpose of conducting this clinical study.

20. It was agreed between FLEMING and Dr. T. / PPI, and understood by them, that this clinical study would involve at least 60 participants, in order that the results have statistical significance. The participates were to eat the soy chips and report to FLEMING every two (2) weeks during the period of the study so that FLEMING could obtain and record certain information, including weight loss and body mass index; and also so that FLEMING could review the diet log kept by the study participants. FLEMING was to send the data so gathered to Dr. T. / PPI for further analysis.

21. From on or about January 29, 2004, and continuing to on or about March 8, 2004, in the District of Nebraska and elsewhere, FLEMING did knowingly and wilfully devise and intend to devise a scheme and artifice to defraud Dr. T. / PPI, and to obtain money by means of material false and fraudulent pretenses and representations.

22. In furtherance of the scheme and artifice, FLEMING represented to Dr. T. / PPI that the soy chip clinical study FLEMING was conducting had at least 60 participants when in fact, as FLEMING then well knew, the clinical study had fewer than 60 participants.

23. In furtherance of the scheme and artifice, FLEMING sent false soy chip clinical study data to Dr. T. / PPI via email and via Federal Express.

24. At the time of these material false and fraudulent pretenses, and representations, and omissions of material fact, FLEMING had already accepted $35,000 for the purpose of conducting this soy chip clinical study, and the purpose of the scheme and artifice was to avoid having to return any or all of the money.

25. On or about the dates set forth below, in the District of Nebraska and elsewhere, for the purpose of executing and attempting to execute the scheme and artifice described above, FLEMING did transmit and cause to be transmitted in interstate commerce by means of wire communication, certain signs and signals, that is email communication between the states of Nebraska and North Carolina, as more particularly described below, knowing at the time of such email communications that the soy chip clinical study had materially fewer participants than reported by FLEMING.

| Count | Date | Description |
| --- | --- | --- |
| 11 | 01/29/04 | email from FLEMING in Nebraska to Dr. T. in North Carolina, claiming that the soy chip clinical study at that time had 52 participants. |
| 12 | 02/25/04 | email from FLEMING in Nebraska to Dr. T. in North Carolina, purporting to report clinical study data for 52 participants. |

all in violation of Title 18, United States Code, Section 1343.

## COUNT 13
## Mail Fraud

At all times material to this Indictment:

26. Paragraphs 10 and 18-25 are realleged and incorporated as if fully set forth herein.

27. On or about March 8, 2004, in the District of Nebraska and elsewhere, FLEMING, for the purpose of executing and attempting to execute the scheme and artifice described above, did cause to be sent and delivered by a commercial interstate carrier, to wit: Federal Express, any matter and thing, to wit: documents and papers purporting to represent four weeks worth of data

9

for 60 participants in the soy chip clinical study, when FLEMING then well new some of the data was fabricated because the clinical study did not have 60 participants.

In violation of Title 18, Untied States Code, Section 1341 and 2.

A TRUE BILL



███████████████
FOREPERSON

JOE STECHER
United States Attorney

The United States of America requests that trial of this case be held in Lincoln, Nebraska, pursuant to the rules of this Court.

ALAN L. EVERETT
Assistant U.S. Attorney

10