IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:07CR3005 |
| | ) | |
| v. | ) | |
| | ) | |
| RICHARD FLEMING, | ) | MEMORANDUM AND ORDER |
| | ) | |
| Defendant. | ) | |
| | ) | |


The defendant was indicted on January 18, 2007, and is represented by the Federal Public Defender.  Filing no. 1.  The issue currently before the court is whether the defendant remains, or ever was, entitled to court-appointed counsel under the Criminal Justice Reform Act ("CJRA").

PROCEDURAL HISTORY

Based on the defendant's financial affidavit completed under oath and submitted to the court at the outset of this litigation, (see filing no. 72-2), the court appointed the Federal Public Defender to represent the defendant.  CFPlayer, DLP070309-095057/Case ID:0002, at 11:35:38-11:36:45.  Additional financial information related to defendant's financial status was provided by Pretrial Services Officer Mindy Bare to the court prior to the defendant's initial appearance.  See filing no. 72-3.  At the time of the initial appearance hearing, the government argued that the defendant is not indigent, has substantial earning capacity, and is not entitled to appointed counsel under the CJRA.  CFPlayer, DLP070309-095057/Case ID:0002, at 11:45:40-11:50:08.

The court advised the defendant that it would, on its own motion, reconsider appointment of counsel because it appeared the defendant may be able to afford counsel. The defendant was ordered to file under seal, or to submit to the court for filing, a financial affidavit that accurately and completely described the defendant's income, expenses, assets, liabilities, and past employment history; a copy of defendant's resume; a statement explaining the current status of any board licenses and certifications held by the defendant; and his arguments in support of continued appointment of counsel. CFPlayer, DLP070309-095057/Case ID:0002, at 11:50:10-11:52:18.

Pretrial Services filed an amended report of defendant's financial information on March 13, 2007, (see filing no. 14), the defendant submitted his financial information to the court on March 16, 2007, (see filing no. 72-4), and the government submitted the results of its investigation of defendant's financial status on March 17, 2007 (see filing no. 72-5). Upon review of this additional financial information, the undersigned terminated the appointment of the Federal Public Defender to represent the defendant, and gave the defendant until April 6, 2007 to obtain the services of substitute counsel or advise the court that he would proceed without counsel. Filing No. 15.

The defendant filed a motion for reconsideration with supporting evidence, arguing the defendant could not accumulate enough money to pay the large attorney retainer needed for this complex case, and that defendant's prospects for continued high income were "not looking good at the moment [or] for at least several months." Filing No. 16, at CM/ECF p. 1. The undersigned denied the motion to reconsider. Filing No. 17.

2

The defendant appealed the order denying appointment of counsel.  Filing No. 19.  On April 11, 2007, the appeal was sustained by Judge Richard G. Kopf, the presiding judge for this case.  Judge Kopf held the defendant remained entitled to court-appointed representation, but "reserve[d] the power to require the defendant to pay the costs of his defense at a later time should that become appropriate."  Filing No. 23.  Judge Kopf explained:

> The rule is that any doubt as to a person's eligibility for appointment of counsel are to be resolved in a defendant's favor.  Here, the present income string of the defendant, coupled with the defendant's debt load, causes me to doubt whether he could fund the hiring of a lawyer to litigate this complex matter.

Filing No. 23.

On July 17, 2008, the government orally moved the court to "reexamine the issue of the public defender's office being employed in this case."  CFPlayer, DLP080717-095217/Case ID:0003, at 14:36.  The court agreed to reexamine the defendant's financial status and ordered Pretrial Services to conduct an investigation.  To further that investigation, the defendant was instructed to provide Pretrial Services with his tax returns, pay stubs, income statements, a financial affidavit current as of the time of filing, and bank statements for the period since counsel was appointed to the present to the extent that these documents reflect income received by the defendant.  The court advised the parties and Pretrial Services that if upon review of defendant's supplemental information, any of them believed a hearing was warranted, they should request a hearing.

The defendant partially disclosed his financial information to Pretrial Services.  See filing no. 72-6, att. A, at CM/ECF pp.

3-12.  He provided printouts of his Bank of America checking account, but only for the time period of June 30, 2008 through July 16, 2008.  No income was reflected in this two-week checking account printout.  See filing no. 72-6, att. A, at CM/ECF pp. 11-12.  He provided no statements from the Frontier Financial and Greater Nevada Credit Union accounts previously identified in his March 2007 Personal Financial Statement.  Filing No. 72-4, at CM/ECF p. 5.  The defendant provided his 2007 Form 1040 tax return with Schedules A and C.  Schedule C reflected gross income receipts of $195,336 offset by $153,978 in business expenses (including expenses for travel, meals and entertainment of $92,949, and $35,000 for interest paid to "Other . . . . . . . .SEE STMT"), and "Expenses for business use of your home," resulting in a total taxable business income of $32,164.  The "STMT" referenced as supporting his Schedule C deducted interest, Form 8829 for deducted home expenses, the supporting statements referenced in Schedule A, and the defendant's Form SE were not provided to Pretrial Services.  See filing no. 72-6, att. A, at CM/ECF pp. 7-10.  The defendant provided Pretrial Services with a payroll statement from Alliance Recruiting for the time period beginning September 1, 2007 through July 17, 2008, and pay stubs revealing a weekly income of $2125.  See filing no. 72-6, att. A, at CM/ECF pp. 4-6.  He did not, however, provide pay information from TopDocs, or any other income source.  The defendant's financial disclosure dated July 22, 2008 stated his income is variable, and included an attached Alliance payroll statement showing total payments of $38,380.  The financial disclosure further stated he owns two vehicles, a Hummer and a Chevy.  See filing no. 72-6, att. A, at CM/ECF p. 4.

Pretrial Services conducted its own investigation, (see filing no. 72-6, att. C, at CM/ECF pp. 22-42), and also received

information from Health and Human Services OIG Special Agent
Kathy Palmer regarding the defendant's financial status.  See
filing no. 72-6, att. B, at CM/ECF pp. 13-21.  The income and
asset information obtained by Pretrial Services and Agent Palmer
was not wholly consistent with the information provided by the
defendant.  Specifically, Agent Palmer's assessment of
defendant's income was substantially higher than the income
reflected on the pay documentation disclosed by the defendant,
and it appeared the defendant had understated his vehicle
ownership interests.  Pretrial Services' report to the court
stated:

> Given what could be potentially significant
> discrepancies that have surfaced as a result of this
> investigation, Dr. Fleming's financial status remains
> unclear.  Should the Court consider the information
> submitted in this report to have potential to change
> the defendant's qualification and/or approval for
> appointed counsel in this case, it is respectfully
> recommended that a hearing be held to allow the parties
> to address and clarify the concerns noted.

See filing no. 72-6, at CM/ECF p. 2.

The court scheduled a hearing to "determine [defendant's]
eligibility for continued appointment of counsel and whether, if
he is found ineligible, he should be ordered to reimburse the
United States or the Federal Defenders Office for the expenses
and fees incurred to date."  Filing No. 64.  The hearing was held
on September 25, 2008.  The evidence submitted at the hearing
consisted of the relevant filings of record, the memorandum of
Pretrial Services Officer Mindy Bare dated July 28, 2008,
(CFPlayer, DLP080925-075657/Case ID:0002, at 09:03:54-09:04:50),
all submissions to the court for all prior proceedings regarding
defendant's financial status, (CFPlayer, DLP080925-075657/Case
ID:0002, at 09:04:50-09:05:45), and the testimony of Agent

5

Palmer.  The documents submitted to the court for consideration of defendant's financial status, but not previously filed of record, have now been filed as the "Court's Index of Evidence." Filing No. 72.

For clarification, in addition to the testimony of Agent Palmer, the evidence considered by the undersigned magistrate judge on the government's pending motion to re-examine appointment of counsel for the defendant consists of the following:

Filing No. 14:   The Amended Report of Pretrial Services filed on March 13, 2007.

Filing No. 16-2:   Defendant's evidence in support of his motion to reconsider termination of appointed counsel.

Filing No. 72-2:   Defendant's financial affidavit dated February 28, 2007.

Filing No. 72-3:   The report of Pretrial Services dated February 1, 2007.

Filing No. 72-4:   Financial information submitted by the defendant to the court on March 16, 2007.

Filing No. 72-5:   Financial information submitted by the government to the court on March 17, 2007.

Filing No. 72-6:   Pretrial Services financial information update dated July 28, 2008; including,

   Att. A, at CM/ECF pp. 3-12: Defendant's financial disclosure dated July 22, 2008;

   Att. B, at CM/ECF pp. 13-21: Agent Palmer's Report of Investigative Activity; and

6

> Att. C, at CM/ECF pp. 22-42:
> Defendant's pay stubs with
> spreadsheet summary prepared by
> Pretrial Services.

Having thoroughly reviewed and compared the documents in evidence, the court notes that throughout the course of this litigation, the defendant has never produced a financial statement or listing of income, assets, and debts that is wholly consistent with his prior submission(s), and has never offered anything to explain why his financial disclosures appear inconsistent or incomplete.

The following statement of facts attempts to trace the progression of the defendant's income, assets, and liabilities from the outset of this case to present, and sets forth the credible evidence accumulated from the outset of this case until the time of the September 25, 2008 hearing.  Based on this information, the undersigned concludes that the appointment of the Federal Public Defender to represent the defendant should be terminated.

STATEMENT OF FACTS

A.   <u>Income and Earning Capacity</u>.

During his initial interview with pretrial services on January 29, 2007, the defendant stated that he graduated from the University of Iowa Medical School in 1986 with training in nuclear cardiology, and was at that time employed as a cardiologist for the VA Hospital in Reno, Nevada.  He stated his monthly income was $18,000 per month.  Filing No. 72-3.

However, when the defendant completed and signed a financial affidavit on February 28, 2007, he stated he was self-employed through "TopDocs," and during the prior 12 months, he had received no "income from a business, profession or other form of self-employment, . . . or from any other source."  Filing No. 72-2.  In direct contrast to this income disclosure, the government submitted evidence establishing that from September 12, 2005 through February 25, 2007, the defendant received $301,418.96 from TopDocs, or an average of approximately $16,745 per month for that eighteen-month period.  Filing No. 72-5, at CM/ECF pp. 7-8

Judge Kopf was concerned, however, that the defendant's "present income stream" would not sufficiently cover the cost of defendant's counsel for this complex case, perhaps due in part to the defendant's February 28, 2007 financial affidavit statement that he would likely lose income with the loss of his TopDocs assignment to the Veterans Administration Hospital.  Filing No. 72-2.  See also, filing no. 16-2, at CM/ECF p. 4.  The defendant's March 16, 2007 financial disclosure stated:

> Current income (decreased when I could have started
> making headway) has changed as a result of OIG action
> the Reno, NV VA.  $440 per 8 hour day.  Given the
> travel involved this means I will either get paid for 3
> (or if lucky) 4 days per week.  From this I will need
> to pay taxes and any other deductions usually taken out
> by a self-employed individual.

Filing No. 72-4, at CM/ECF p. 8.

However, based on the evidence submitted at the hearing held on September 25, 2008, the defendant's VA Hospital placement was replaced by a new contract to provide work for the U.S. Coast Guard, and the defendant's earnings for the nearly 12-month time

period from February 26, 2007 through February 13, 2008 equaled or exceeded his VA earnings.  During this time period, the defendant earned $209,735.74, or an average of approximately $17,475 per month, from TopDocs, with all associated housing, transportation, and malpractice expenses reimbursed by TopDocs. Filing No. 72-6, at CM/ECF pp. 14, 19-20.  Agent Palmer obtained this TopDocs income information and provided it to Pretrial Services; the defendant never disclosed this income.  See filing no. 72-6, Att. A, at CM/ECF pp. 3-12.  Based on defendant's 2007 tax return, he paid less than $300 a month in federal taxes on his approximately $17,000 per month gross income for that year. See filing no. 72-6, at CM/ECF pp. 7-10.

As of July 25, 2008, TopDocs reported that it had been unable to find work for the defendant "lately" (also referred to as "a couple months").  Filing No. 72-6, at CM/ECF p. 14. Although the defendant claims the pending federal charges have hindered his ability to find work through TopDocs, which places physicians in federal facilities, the defendant has not been "convicted" of any crime, (see 18 U.S.C. § 1347), and TopDocs did place the defendant in contract work at federal facilities for at least a year following his indictment.  TopDocs reported that defendant's "pompous and egotistical" attitude is the source of the difficulty encountered when trying to place or retain the defendant in contract work assignments.  Filing No. 72-6, at CM/ECF pp. 14-15.

The defendant did receive assignments to work for a Poplar Bluffs medical facility through Alliance Recruiting for the time period of April 7, 2008 through April 20, 2008 and May 5, 2008 through May 18, 2008, and he disclosed the $38,380 of income received for these four weeks of work.  Filing No. 72-6, at

CM/ECF p. 4. However, the defendant has provided no bank record indicating where he deposited his Alliance Recruiting income, or any of the income he received through TopDocs placements.  The defendant also apparently worked for the Poplar Bluffs facility from October 2007 through October 2008, (filing no. 72-6, at CM/ECF p. 16), but no income records from this employment have been filed with or submitted to the court.

The $195,336 in reported business earnings on defendant's 2007 Schedule C, is apparently the $195,336 defendant received from TopDocs alone in 2007.  Filing No. 72-6, at CM/ECF p. 19. However, the defendant's 2007 Schedule C also reports deductible business expenses for travel, meals, and entertainment totaling $92,949.  Filing No. 72-6, at CM/ECF p. 10.  The source of these apparently non-reimbursed business expenses, and the business for which they were incurred, is unknown.  TopDocs reimbursed the defendant for his housing, transportation, and malpractice fees, and in 2007, paid the defendant $24,720.89 for expense reimbursements and $648.00 for mileage reimbursements.  Filing No. 72-6, at CM/ECF p. 14.

The defendant disclosed bank statements for only the June 30, 2008 through July 16, 2008 time frame.  The defendant has submitted no bank statement reflecting any income deposits in any account anywhere.  There is no record disclosed by the defendant or found by Pretrial Services or Agent Palmer indicating the defendant worked anywhere in June or July of 2008, or explaining why he did not work.  The defendant did attend a medical conference in Berlin, Germany, at his own expense and with his sons and a significant other, from July 2 through July 8, 2008.

10

The defendant was scheduled by Alliance Recruiting to work from August 11 through 31, 2008, and possibly for two weeks in September, 2008, but no income records were submitted to the court for these time frames.  Filing No. 72-6, at CM/ECF p. 16.

B.   Monetary Assets.

During his January 29, 2007 interview with Pretrial Services, the defendant stated he had $7200 in a Bank of America savings account.  Filing No. 72-3, at CM/ECF p. 2.  His February 28, 2007 financial affidavit and March 16, 2007 disclosure both stated he had no money in any savings or checking account. Filing No. 72-2; filing no. 72-4, at CM/ECF p. 5.

The defendant has never provided a statement for his Bank of America savings account initially disclosed to Pretrial Services, and has not explained why the $7200 in assets within that account on January 29, 2007 no longer existed as of February 28, 2007.

As of July 31, 2005, the defendant had an IRA retirement account through Wells Fargo Investments with total assets of $14,671.80.  Following his 2006 divorce, the defendant retained a one-half interest in the Wells Fargo IRA account.  The defendant has never disclosed this account, including in his March 16, 2007 financial statement asking him to list all "bank accounts," defined to include "IRA & KEOGH accounts."  Filing No. 72-4, at CM/ECF p. 5.  The defendant has not explained why this account no longer exists or what happened to his share of the proceeds. Filing No. 72-5, at CM/ECF p. 13.

11

C.   <u>Debts, Payments, and Household Expense Obligations</u>.

The following debts and expenses have been described in cumulative evidence presented to the court.

1.   Household expenses.

Although a comparison of the defendant's submissions reveals they were not entirely complete, the court finds the defendant has, since the outset of this litigation, consistently had the following monthly household expenses unrelated to accumulated debt:

```
Rent                  $1360
Utilities               100
Auto Insurance          500
Renter's Insurance       70
Cell phone              250
Food/Clothing           400
Life Insurance          125
Gasoline                100

Total                 $2905
```

Filing No. 72-4, at CM/ECF p. 8; filing no. 72-6, at CM/ECF p. 4. The defendant has never listed unreimbursed travel or work expenses within his listing of monthly payments or obligations.

2.   Support Obligations.

In addition, the defendant's financial affidavit completed on February 28, 2007 disclosed a monthly support obligation of $3600.00 comprised of alimony owed to his ex-wife and child support for his three child dependents; Stephanie, Christian, and Matthew Fleming.  Filing No. 72-2.  As of March 16, 2007, this support obligation was $3,642.45, with the child support to be

12

reduced in one year when the defendant's oldest child turned nineteen.  Filing No. 72-5, at CM/ECF p. 3.  The defendant's financial disclosure dated July 22, 2008 states his child support and alimony obligation is now $3384.06 per month.  Filing no. 72-6, at CM/ECF p. 4.

3.   Debts and debt payments.

Information regarding the defendant's debt has been provided by various sources.  Upon review of the evidence, it appears many of defendant's debts were paid before this litigation began, and as to other disclosed debts, the defendant has failed to prove he is personally liable for or making any payments on these debts.

Home Mortgage

During his interview with Pretrial Services on February 1, 2007, the defendant stated his liabilities included a $300,000 mortgage on the home he owned with his ex-wife.  Filing No. 72-3. Although the initial mortgage on this home was $300,000, as of August 2006, only $91,267.14 remained owed and the defendant had stopped making the scheduled monthly payment of $1311.56.  Filing No. 72-5, at CM/ECF p. 11.  The house had been used to secure other loans, resulting in several liens against the house.  When the house was sold on February 7, 2007, the total lien amount exceeded the value in the home.  The sale proceeds paid off the primary mortgage held by Wells Fargo, (filing no. 72-5, at CM/ECF p. 12), and the remaining proceeds were used to pay other liens on the home.  Filing No. 72-5, at CM/ECF pp. 3-4.   The defendant was no longer disclosing a home mortgage debt when his financial affidavit was completed on February 28, 2007.  Filing No. 72-2.

Bank of the West

The defendant did not mention a debt to Bank of the West when interviewed by Pretrial Services on January 29, 2007. Filing No. 72-3, at CM/ECF p. 2.  He listed this debt, in the amount of $183,000, in his February 28, 2007 financial affidavit, and in his evidence offered on the court's sua sponte motion to reconsider appointment of counsel.  Filing No. 72-2; filing no. 72-4, at CM/ECF p. 8.  Based on defendant's disclosure dated July 22, 2008, his debt to Bank of the West has increased to $194,000. Filing No. 72-6, at CM/ECF p. 4.

The defendant has submitted no documentary evidence confirming the amounts paid or owed on this alleged debt, and the court has no information concerning the purpose, term, or monthly payment obligation on this debt.  The defendant's ex-wife, who openly provided detailed information regarding the defendant's debts as disclosed during their 2006 divorce proceedings, never mentioned any debt owed to Bank of the West, and never listed this debt as secured by a lien on the marital residence and unsatisfied after that property was sold in 2007.  Filing No. 72-5, at CM/ECF pp. 3-5.

Based on the evidence before me, the defendant has failed to prove he personally[1] owes money on the Bank of the West debt described in the record, or that he is personally required to make monthly payments on this debt.  No one has made a payment on this loan since August 2006, which undermines any claim that

---

[1]For example, based on the documents before this court, it appears any judgment in favor of Vann Realty would have been entered against "Fleming Heart & Health Institute, P.C.," and not the plaintiff personally.  Filing No. 72-5, at CM/ECF p. 22.  See also footnote 2.

14

making monthly payments to Bank of the West lowers the disposable income available for paying legal fees.

Even if I assume the defendant obtained a personal loan from Bank of the West, in the absence of any loan documentation provided by the defendant, the court must consider all the facts and inferences from those facts to determine whether that debt indicates the defendant cannot afford counsel. Based on the defendant's disclosures, he owns no real estate or unencumbered personal property, and has no financial assets. If the defendant was personally liable on a Bank of the West debt before his divorce proceedings were initiated, he had a strong financial incentive to disclose this debt during those proceedings for the purposes of equitable division of the property and in response to his wife's request for alimony. He apparently did not do so. Accordingly, if the defendant is personally responsible for a $183,000 debt owed to Bank of the West, he obtained this loan without pledging any security; he likely received the loan during or after the divorce proceedings; and at that time, he was able to convince a bank that he was creditworthy with an income stream sufficient to service an unsecured loan in the amount of $183,000.

Simply stated, the financial statement defendant provided to Bank of the West must have been quite different from the ones submitted to this court.

### First Westroads Bank

The defendant's March 16, 2007 disclosure listed a debt of $156,000 owed to First Westroads Bank. Filing No. 72-4, at CM/ECF p. 8. This debt was actually paid off when the marital

15

residence was sold in February of 2007. Filing No. 72-5, at CM/ECF p. 4. The defendant did not list this debt in his July 22, 2008 financial disclosure. Filing No. 72-6, at CM/ECF p. 4.

### First National Bank Line of Credit

Prior to March 1, 2007, the defendant owed $57,000 on a line of credit issued by First National Bank. This debt was paid when the marital residence was sold. Filing No. 72-5, at CM/ECF p. 4.

### Commercial Federal lien

Evidence was presented in March 2007 that Commercial Federal had a fourth lien on the marital residence that was not satisfied by the sale of the house. The unsatisfied debt was allegedly $160,000. Filing No. 72-5, at CM/ECF p. 4. Although defendant's ex-wife disclosed this information, Agent Palmer never confirmed this debt, and the defendant has never listed the existence of any debt owed to Commercial Federal in any of his submissions to the court. There is insufficient evidence that the defendant has ever owed or accepts any obligation to make monthly payments on this debt.

### Wells Fargo debt

Likewise the $20,000 debt to Wells Fargo Bank reported by defendant's ex-wife was never disclosed by the defendant nor investigated by Agent Palmer. There is insufficient evidence that this alleged debt is owed by the defendant. Filing No. 72-5, at CM/ECF pp. 3-4, 13.

Byam & Hoarty Law Firm debt

As of March 2007, the defendant's ex-wife reported that the defendant owed $6,700 to Byam & Hoarty Law Firm.  Filing No. 72-5, at CM/ECF pp. 4, 18-21.  Although the defendant has disclosed attorney fees debts owed to other counsel, he has never disclosed the existence of any such debt owed to the Byam & Hoarty Law Firm.  Filing No. 72-4, at CM/ECF p. 8; filing no. 72-6, at CM/ECF p. 4.  As of March 2007, the defendant had made no payments on this debt since April 28, 2006.  Filing No. 72-5, at CM/ECF pp. 18-21.

Since the defendant has failed to disclose any debt owed to Byam & Hoarty Law Firm, the court assumes the defendant has either paid this debt in full, disputes the debt, or is making no debt payments and has no intention to do so.

Stinson, Morrison & Hecker

The defendant's March 16, 2007 disclosure stated he owed $20,000 to the Stinson, Morrison law firm for legal assistance. Filing No. 72-4, at CM/ECF p. 8.  His July 22, 2008 disclosure does not mention this debt.  Filing no. 72-6, at CM/ECF p. 4. Accordingly, the court assumes that either this debt is now paid, or the defendant is not making, and Stinson, Morrison is not pursing, payment.

Marks, Claire & Richards

The defendant's March 16, 2007 submission disclosed a $500.00 debt owed to his divorce counsel, Marks, Claire & Richards.  Filing No. 72-4, at CM/ECF p. 8.  Based on defendant's

17

July 22, 2008 disclosure, this debt remains unpaid and
defendant's monthly payment to his divorce counsel "varies."
Filing no. 72-6, at CM/ECF p. 4.

### Goracke, Ritterbush & Piotrowski, LLP

Although as of March 2007, the defendant allegedly owed a
debt to this Nebraska CPA firm in the amount of $4,769.96,
(filing no. 72-5, at CM/ECF pp. 5, 24-25), he did not acknowledge
the existence of this debt in either his February 2007 financial
affidavit or his July 2008 financial disclosure, and has made no
payments on this debt for over six years.  There is no evidence
the CPA firm reduced its debt to a judgment within five years of
the last payment.

### Vann Realty Company

A suit was filed by Vann Realty against Fleming Heart &
Health Institute, P.C. in September 2004, (filing no. 72-5, at
CM/ECF pp. 22), and a default judgment was entered in that case
in August of 2006.  Filing No. 72-5, at CM/ECF p. 5.  The
defendant did not list this alleged judgment debt in his February
2007 financial affidavit, (filing no. 72-2), but his March 16,
2007 disclosure lists a case brought in Douglas County Court
during the summer of 2006 by Vann Realty involving $125,000.
Filing No. 72-4, at CM/ECF p. 6.  No payments have been made on
this debt since April, 2004.  Although the defendant lists a Vann
Realty debt of $140,000 in his July 22, 2008 financial
disclosure, he has presented no evidence that he is personally

liable for any debt or judgment owed to Vann Realty by Fleming
Heart & Health Institute, P.C.[2]

    Credit Card/Consumer debt

    In his initial interview with Pretrial Services, the
defendant stated he had a credit card balance of $9000.00, with a
$750-800 monthly payment obligation.  Filing No. 72-3, at CM/ECF
p. 2.  His February 28, 2007 financial affidavit disclosed a Bank
of America Visa balance of approximately $9800.00, with a monthly
payment obligation of $700.00.  Filing No. 72-2.  His March 16,
2007 disclosure listed a AAA credit card (believed to be his Bank
of America "AAA Nebraska Platinum Plus VISA," see filing no. 72-
6, at CM/ECF p. 11), with a $9893 balance, and a $300.00 monthly
payment, and a $3100.00 debt to Macy's for furniture, with a
$600.00 monthly payment obligation.  Filing No. 72-4, at CM/ECF
p. 8.  Defendant's July 22, 2008 financial disclosure does not
list a Macy's debt, (filing no. 72-6, at CM/ECF p. 4), and based
on defendant's stated monthly payment obligation on this debt and
his non-disclosure of the debt on July 22, 2008, presumably the
debt to Macy's has been paid.

    Although the defendant's July 22, 2008 financial disclosure
does not list a credit card debt, the defendant has also

_____

    [2]See e.g., Katz, Professional Corporation Stockholders'
Nonmalpractice Liability, 50 A.L.R.4th 1276 (1986)(discussing
state law cases determining when and to what extent a
professional corporation shareholder is liable for a corporate
liability that did not arise from alleged negligence in rendering
professional services).  It is unclear where Fleming Heart &
Health Institute, P.C. was incorporated; an Illinois address was
listed on the Douglas County Court docket sheet.

submitted a monthly statement for his credit card indicating that
as of July 17, 2008, he had a credit card balance of $10,114.95.
Filing No. 72-6, at CM/ECF p. 11.

GMAC

On January 29, 2007, the defendant told Pretrial Services
that he owned a 2007 Hummer 3 valued at $41,000, and had a "GMC"
debt of $41,000.  Filing No. 72-3, at CM/ECF p. 3.  The
defendant's financial statement dated February 28, 2007 stated he
owned no automobiles, but disclosed a debt owed to "GMAC" in the
amount of $40,000, with required monthly payments of $1344.10.
Filing No. 72-2.  Later submissions to the court clarified that
the GMAC loan was used to purchase and is secured by the
defendant's 2007 Hummer, (filing No. 72-4, at CM/ECF p. 5), and
that the defendant also owns a 1992 "Chevy."  The "Chevy" is a
1992 Chevrolet Corvette convertible.  Filing No. 72-5, at CM/ECF
p. 3.

While the defendant was receiving free counsel in this
litigation, he was able to pay down approximately $23,000 of the
principal owed on his Hummer loan, (compare filing no. 72-4, at
CM/ECF p. 5, filing no. 72-6, at CM/ECF p. 4), and was also able
to buy a 2004 Dodge Stratus for his son, Christian, without
incurring another vehicle debt.  As of July 22, 2008, the
defendant claimed the remaining $17,000 to $18,000 owed on his
Hummer loan exceeded the value of the Hummer, and the fair market
value of his 2007 Hummer and his 1992 Chevrolet Corvette
convertible combined totaled only $17,500.  Only sixteen months
earlier, the defendant estimated the total value of the vehicles
was $43,800 (the Hummer valued at $35,000 and the Corvette
convertible valued at $8800).  Filing No. 72-6, at CM/ECF p. 4.

20

Absent any explanation by the defendant, this precipitous devaluation of the vehicles is not credible.  Rather, the defendant appears to be lowering his self-reported vehicle valuations to defuse any argument that he could sell one of the vehicles and use the proceeds to retain an attorney, or that he cannot justifiably receive free legal counsel while simultaneously owning these two high-value specialty vehicles.

"Other Debts"

The defendant March 16, 2007 financial statement disclosed "other debts" totaling $299,000.  No evidence was provided to identify the creditor or explain the nature, purpose, and alleged payment owed on these "other debts."  Based on how the March 16, 2007 statement was written, it is possible these "other debts" were intended to include defendant's alleged Vann Realty, First Westroads, and Bank of the West debts, but the total for those debts far exceeds $299,000.  Filing No. 72-4, at CM/ECF p. 8. The "other debts" identified in defendant's July 22, 2008 disclosure include his alleged Bank of the West and Vann Realty debts.  Filing No. 72-6, at CM/ECF p. 4.

The defendant has failed to prove he now has, or ever had during the course of this litigation, $299,000 in "other debts." To the extent the defendant has and is obligated to make debt payments, those debts are specifically identified by creditor and discussed in this memorandum and order.

D.   Cost of Counsel.

The defendant contacted two attorneys in Reno, NV and the Stinson, Morrison law firm with offices in Kansas City and Omaha

21

regarding the costs to retain representation.  The lawyers from
Nevada are unwilling to represent the defendant absent a $60,000
up-front retainer; neither attorney will accept payments.
Counsel from Stinson, Morrison charges $375 per hour and
estimates the cost of defendant's representation would exceed
$150,000.  Stinson, Morrison will not represent the defendant
absent an advance retainer of $200,000.  Filing No. 16-2.

The defendant apparently contacted no lawyers in Lincoln,
Nebraska, where the hourly fees are lower, the attorney travel
time and costs would be minimal, and his new counsel could
efficiently access the records accumulated and the work performed
to date by the public defender.

DISCUSSION

The Criminal Justice Act provides the framework for ensuring
that individuals who are financially unable to afford counsel are
provided counsel as required by the Sixth Amendment.  U.S. v.
Fincher, 538 F.3d 868, 875 (8th Cir. 2008).  "A person is
eligible for court appointed counsel if, after the United States
magistrate judge or court conducts an 'appropriate inquiry,' the
court is satisfied that 'the person is financially unable to
obtain counsel.'"  Id. (quoting 18 U.S.C. § 3006A(b)).
"Financial inability to obtain counsel is not the same as being
indigent or destitute, but the defendant has the burden of
establishing that he or she is financially unable to obtain
counsel."  Id.  "If at any time after the appointment of counsel
the United States magistrate judge or the court finds that the
person is financially able to obtain counsel or to make partial
payment for the representation, it may terminate the appointment

of counsel or authorize payment as provided in subsection (f), as the interests of justice may dictate." 18 U.S.C. § 3006A(c).

Based on the foregoing, the court finds the defendant is and has through the course of this litigation, attempted to mislead the court by substantially understating his past, current, and anticipated future income; failing to disclose or undervaluing financial assets; and overstating his ongoing debt obligations. The defendant has correctly disclosed his court-ordered support obligations, such obligations being easily verified upon review of the state divorce proceedings of record.  Other than that, and as described item-by-item in this memorandum and order, the defendant cannot keep his story straight.

Despite his statement to the contrary, the defendant has earned throughout this litigation, and is able to continue earning, at least $17,000 per month in income.  His federal tax liability on these earnings is, based on his self-prepared return, less than 2%.  Although the defendant's claimed deductions reduce his taxable income to less than $3000 per month, he has failed to provide any detailed explanation of the underlying basis of those deductions.  The amount of claimed business expenses on Schedule C of the 2007 tax return are, at the very least, highly suspect since TopDocs paid the defendant's travel expenses for performing his job in 2007.

The defendant has not cooperated in fully disclosing his income.  He failed to disclose the February 2007 to February 2008 income he received from TopDocs, and did not provide any bank statements showing where he deposited or deposits the income he receives.  The defendant is an independent contract physician, and even now, the court cannot be certain it has uncovered all

the defendant's income sources.  In addition, defendant's
statement regarding accumulated monetary assets is not credible.
He has failed to explain what happened to the $7200 he had in
savings on January 29, 2007, or his Wells Fargo IRA--disclosed
only by his ex-wife and never by the defendant.  The court is
left with the inescapable conclusion that the defendant is hiding
both his assets and income in an effort to obtain and retain free
legal counsel.

Several information sources were considered when determining
the true extent of the defendant's debt.  This step was necessary
because the defendant's self-report of debt was incomplete and/or
inconsistent with his prior reports or the government's evidence.
The following creditors, or possible creditors, were identified
in the evidence:

| | |
|---|---:|
| Wells Fargo (home mortgage) | $300,000 |
| Bank of the West | 194,000 |
| First Westroads Bank | 156,000 |
| First National Bank (line of credit) | 57,000 |
| Commercial Federal | 160,000 |
| Wells Fargo | 20,000 |
| Byam & Hoarty Law Firm debt | 6,700 |
| Stinson, Morrison & Hecker | 20,000 |
| Marks, Claire & Richards | 500 |
| Goracke, Ritterbush & Piotrowski, LLP | 4,770 |
| Vann Realty Company | 125,000 |
| Bank of America Credit Card | 10,000 |
| Macy's | 3,000 |
| GMAC | 18,000 |

Any debt owed on the Wells Fargo home mortgage, First
Westroads Bank loan, and First National Bank loan was paid when
the marital residence was sold on February 7, 2007, before
counsel was appointed for the defendant.  There is insufficient
evidence that the Commercial Federal and Wells Fargo debts
identified by the defendant's ex-wife existed or remain unpaid.

The defendant has failed to prove he personally owes the judgment
debt entered in favor of Vann Realty Company, or any amount to
Bank of the West.  The defendant has not acknowledged owing
anything to Byam & Hoarty Law Firm, and apparently makes no
payments to either Byam & Hoarty or Stinson, Morrison & Hecker.
His debt to Marks, Claire & Richards is only $500, and his
payment on that debt "varies."  The defendant has not paid
anything to Goracke, Ritterbush & Piotrowski, LLP since 2002, and
it is likely any action for payment is now barred by the statute
of limitations.  His $3000 debt to Macy's was apparently paid
during the course of this litigation.

Of the debts listed, the proven monthly debt obligations
include an approximate $200 per month payment owed on defendant's
$10,000 credit card debt, (filing no. 72-6, at CM/ECF p. 11), and
a $1344.10 per month payment owed on the $18,000 balance
remaining on defendant's Hummer loan.  Filing No. 72-2.  Both
debts arise from the same source:  The defendant lives a wealthy
lifestyle, perhaps beyond his means.

The defendant is a contract physician who lives in Nevada
and either works out of his home or travels to his work sites
outside Nevada.  He can live anywhere and perform that job.  He
need not live in an apartment with rent exceeding $1300 per
month.

Despite receiving $17,000 a month in income, the defendant
apparently never pays down his credit card debt.  His credit card
balance was $9800 in February 2007, and remained at $10,000 in
July of 2008.  The defendant did not, however, reduce his
lifestyle during that time frame.  The defendant traveled with
his two sons and a "significant other" to put on a poster

25

presentation at a ComTech Med nuclear cardiology conference held
in Berlin, Germany.  It can be reasonably inferred that the
defendant paid the travel costs for not only himself, but at
least his two sons.  Defendant's sons are both children, and
their mother did not pay the travel costs for the sons' trip to
Berlin.  The conference registration cost was $764.  The
conference began on July 3 and ended on July 6, 2008, but the
defendant stayed in a hotel in Germany from July 2 through July
8, 2008.  The defendant had two hotel rooms:  one for the
defendant and his significant other, and one for his sons.  The
cost of defendant's hotel room alone was $2005.  Additional
amounts were paid to purchase airfare for the defendant and his
sons, but the cost of these expenses is unknown.

The defendant owns a 2007 Hummer and a 1992 Corvette
convertible.  He does not need two vehicles, and while the court
agrees the defendant needs a vehicle, no one needs a 2007 Hummer
or a Corvette convertible.  While defendant's vehicle payments
are high, self-imposed poverty is not a valid basis for free
legal counsel.

The court recognizes that "[a] criminal defendant who can
afford to contribute some amount to the expense of his defense
but who cannot afford to hire counsel because his own resources
are inadequate either to pay a retainer or to assure private
counsel of full payment is functionally akin to an indigent
defendant and equally entitled to court-appointed counsel."
Hanson v. Passer, 13 F.3d 275, 278 (8th Cir. 1994).  However, in
2007, the defendant stated his Hummer and Corvette were worth
$43,800.  Filing No. 72-6, at CM/ECF p. 8.  Rather than sell even
one of these vehicles to pay off the $18,000 remaining on the
Hummer loan, with the remainder used to retain an attorney, the

defendant wants to own and drive both vehicles while continuing
to assert a right to court-appointed counsel.  While a defendant
is considered financially unable to obtain counsel if he cannot
obtain adequate representation without imposing "substantial
hardship" on himself or his family, (Hanson, 13 F.3d at 278-279),
the defendant will not suffer any "hardship" if required to sell
his 2007 Hummer, scale-down his vehicle choice, and with that,
eliminate his car payment.

Even absent selling a vehicle, the court believes the
defendant has assets to retain counsel.  More importantly, the
defendant has failed to prove otherwise.  The record clearly
reveals defendant's pattern and practice of failing to fully
disclose his income and assets upon court order or under oath.
Whether this conduct is intentional, reckless, or just flippant
is unknown, but it is clearly intolerable.  As counsel for the
government argues, the defendant "is playing us for fools."

The defendant has a $17,000 per month on-going income
stream, and has had this income since this lawsuit was initiated.
Even assuming a 42% income tax assessment[3], the defendant is left
with over $9,800 a month to live on.  After subtracting monthly
household expenses ($2905), those debt payments remaining after
the Hummer is sold ($200), and his court-ordered support

---

[3]This tax rate far exceeds the 2% tax rate currently paid by
the defendant, but the court questions the propriety of the
deductions and expenses historically used by the defendant in
determining his tax liability.  The 42% tax assessment chosen
actually exceeds the "worst case scenario" for defendant's
federal taxation.  It was calculated by recognizing that, absent
any deductions, a yearly income of $196,000 lies in the 33%
federal tax bracket, with an 8.8% effective self-employment tax
obligation added for those who, like the defendant, are self-
employed.

obligations ($3384), the defendant would still have a monthly disposable income of approximately $3300.  Even in a complex case such as the one presented, the defendant can afford to pay his on-going attorney expenses.

The defendant has failed to meet his burden of proving that he currently or ever lacked the assets to retain an attorney or pay for legal representation.  To the extent a contrary decision was previously made, that decision was based on a low income projection that did not come to fruition, and incomplete or incorrect information provided by the defendant.  The appointment of the Federal Public Defender as counsel for the defendant will be terminated.  In addition, the defendant will be required to pay for the legal services that have been provided to him by the Federal Public Defender during the course of this litigation.

IT THEREFORE HEREBY IS ORDERED:

1.   The appointment of the Federal Public Defender to represent the defendant is terminated, effective upon the entry of an appearance by substitute, retained counsel, or defendant's filing of a statement that he will represent himself in this case.

2.   The defendant is given until November 6, 2008 to obtain the services of substitute counsel and have that attorney file an appearance in this case, or, alternatively, to inform the court, by pleading, that he will represent himself in this case.

3.   On or before November 6, 2008, and in accordance with the guidelines set forth in Nebraska Criminal Rule 44.3(b), the Federal Public Defender shall submit to the court a statement of its fees and expenses incurred in representing the defendant.

Dated this 16th Day of October, 2008.

BY THE COURT:

s/ *David L. Piester*
_____
David L. Piester
United States Magistrate Judge