**MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY**

| **United States District Court** | District Nebraska | |
|---|---|---|
| Name: Richard Fleming | | Case No.: 4:07-cr-03005-RGK-DLP |
| Place of Confinement: : 6850 Sharlands Ave, A2001, Reno, Nevada 89523 | Prisoner No.: | |
| UNITED STATES OF AMERICA   v. | Movant (include name under which convicted) Richard Fleming | |

## MOTION

1. (a) Name and location of court that entered the judgment of conviction you are challenging:

   U.S. District Court, Lincoln, Nebraska

   (b) Criminal docket number (if you know):

2. Date of the judgment of conviction: 8/20/2009

3. Length of sentence: 6 months house arrest, 5 years probation

4. Nature of crime (all counts): False Claims Act, Healthcare, Mail and Wire Fraud

5. (a) What was your plea? (Check one)

   (1) Not guilty " (3) Nolo contendere (no contest) "

   (2) Guilty **X**

   (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to?

6. Kind of trial: (Check one)

   Jury **X** Judge only "

7. Did you testify at the trial? Yes " No **X**

8. Did you appeal from the judgment of conviction? Yes " No **X**

9. If you did appeal, answer the following:

   (a) Name of court:

   (b) Docket number (if you know):

   (c) Result:

   (d) Date of result (if you know):

   (e) Citation to the case (if you know):

   (f) Grounds raised:

   (g) Did you file a petition for certiorari in the United States Supreme Court? Yes " No **X** If "Yes," answer the following:

   (1) Docket number (if you know):

   (2) Result:

(3) Date of result (if you know):

(4) Citation to the case (if you know):

(5) Grounds raised:

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or

applications concerning this judgment of conviction in any court? Yes " No **X**

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court:

(2) Docket number (if you know):

(3) Nature of the proceeding:

(4) Grounds raised:

(5) Did you receive a hearing where evidence was given on your motion, petition, application? Yes " No "

(6) Result:

(7) Date of result (if you know):

(b) If you filed any second motion, petition, or application, give the same information:

(1) Name of court:

(2) Docket number (if you know):

(3) Nature of the proceeding:

(4) Grounds raised:

(5) Did you receive a hearing where evidence was given on your motion, petition, or application? Yes " No "

(6) Result:

(7) Date of result (if you know):

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1) First petition: Yes " No "

(2) Second petition: Yes " No "

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

12. For this motion, state briefly every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States.

Attach additional pages if you have more than four grounds. Summarize briefly the facts supporting each ground.

CAUTION: If you fail to set forth all the grounds in this motion, you may be barred from presenting additional grounds at a later date.

For your information, the following is a list of the most frequently raised grounds for relief. Each one is a separate ground for possible relief. You may raise other grounds besides those listed. However, you should raise in this motion all available grounds (relating to this conviction or sentence) on which you base your claim that you are being held in custody unlawfully.

- Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily or with understanding of the nature of the charge and the consequences of the plea.
- Conviction obtained by use of coerced confession.
- Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

- Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.
- Conviction obtained by a violation of the privilege against self-incrimination.
- Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.
- Conviction obtained by a violation of the protection against double jeopardy.
- Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.
- Denial of effective assistance of counsel.
- Denial of right of appeal.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must set out in the space provided below the facts that support your claims.

**GROUND ONE: Denial of effective assistance of counsel.**

(a) Supporting facts (Do not argue or cite law. Just briefly state the facts that support your claim.):

(1) It was Movant's belief that, to be found criminally guilty, the law limited the case and findings to the charges specified in the indictment.

   (a) Despite urgings by Movant, the Public Defender as Defense Counsel did not address the fact that the health care charges did not specify a crime since it charged there were false representations in the filing of Form CMS-1500 when the Medicare Claims procedures provided no means for and explicitly barred descriptive representations. The Medicare claims procedures instead require submitting a numeric code which is a representation the code number provided is the best match for "completeness" and "accuracy" (as defined in the Medicare Claims Manual) among a set of proprietary descriptors. That is what Movant did and what was established at Trial. Prosecution undertook to argue Movant's methods were without medical value. That was not a charge in the indictment but Counsel acquiesced.

   (b) Mail and wire fraud charges rested entirely on an employee's opinion that there were not 60 research participants because she did not see them. Counsel considered the employee's statement she was being coerced by the Prosecution as irrelevant. Counsel resisted Movant's requests that payroll records be obtained showing the employee witness could not have seen most of the participants because the witness was not employed by Movant during most of the time in question. When, after trial, Movant was able to obtain CPA records and reported it to Counsel, Counsel advised that if Movant revealed to the Judge that he had found exculpatory evidence, the Judge would immediately reject the plea deal and commit Movant to jail.

(2) Without credible evidence the Public Defender as Defense Counsel believed and acted upon the belief Movant suffered from a psychiatric disability characterized by delusions of innocence. From the beginning Counsel focused on bringing about a plea deal, *Infra*, Pages A000001-A000004, made no effort to establish innocence, and resisted Movant's efforts to do so, *Infra*, Pages A000005-A000014. As a consequence Movant was denied the presumption of innocence

and a fair trial based on that presumption and on evidence.

(3) Throughout Trial ,plea negotiation, and pre-sentencing, Counsel failed on multiple occasions to resist the introduction of new charges and purported evidence thereto though such charges were not specified in the indictment and Movant was innocent of the indictment specified charges, namely:

(a) " false and fraudulent pretenses and representations, and omissions of material fact, regarding the actual number and types of tomographic studies provided" when representations of "actual number and types" are neither provided for nor permitted under Medicare statutes and procedures, when Medicare instead requires submission of a numeric code arrived at in accord with the Medicare Claims Manual instructions which Movant followed, and

(b) "fabricated" data when Counsel mishandled the expert statistical testimony that there was no evidence of fabrication using test procedures the Government uses and recommends for determining fabrication on "the preponderance of the evidence" where PHS funds are involved and instead concluded the statistician was not credible because she tested for "fabrication" as she was requested to do and as specified in the indictment and did not perform the entirely different tests which would be required for "falsification" and "plagiarism" which are each statutory crimes distinct and different from "fabrication" and are crimes for which Movant was not indicted.

(4) Movant used a measure known as "redistribution" in his diagnostic protocol, a measure requiring multiple images which is included in CPT Code 78465 under which Movant billed. It is not included in CPT 78464, the Code number Prosecution argued was the appropriate billing. In its Trial Brief, Prosecution stated it would prove there was no redistribution of the specific pharmaceutical used (sestamibi)so that Movant's procedure could have no medical value and thus was fraudulent. Counsel failed to resist this introduction of a new medical malpractice charge that was not specified in the indictment. Once the Court admitted these new charges Movant provided, but Counsel failed to present, a body of medical scientific publications in peer reviewed journals showing sestamibi redistribution does occur and has medical diagnostic value.

(5)  The mail and wire fraud charges rested solely on the testimony of Movant's employee that she did not see many of the

participants in the soy study.  Counsel did not  pursue Movant's urgings to obtain copies of payroll records establishing the

employee could not have seen them because she was not employed by Movant for much of the time in question, nor did

Counsel explore the witness's  statement suggesting she was coerced into her testimony, *Infra*, Pages A000009-A000014.

(6)  At sentencing the Prosecutor reiterated the charge the provision of data  constituted mail fraud  because the data were

"relied upon" by Dr. Tabor.  It came out at Trial that Dr. Tabor had falsified his reporting of the data by representing all

participants were women. Counsel did not address the question of  whether there was fraud if the recipient did not "rely

upon" the data.

(7) In essence, charges 11-13 allege Movant contracted to deliver a statistical product but the delivered product was

defective. Counsel was adamant he would not take part in a statistical examination of the product even though the product

was a statistical product and that if  Movant persisted in wishing statistical evidence he would have to get another attorney

(despite his Court ordered representation), *Infra*, Page A000008. If a product is alleged to be defective one examines the

product whether it is an appliance, an automobile, or financial records, and there is no reason to view research products

differently.

(8)  Counsel was not able to cope with the statistical nature of the charges and statistical testimony. He rejected his expert

because she would not testify statistical analyses provide proof beyond a shadow of a doubt, *Infra*, Page A000007, when

such a standard is not achievable and is not recognized in the legal system. The legal explication of the statistical concepts

of probabilities are "reasonable doubt" and "preponderance of the evidence". He further concluded the Defense expert was

not credible because she proved data could pass fabrication tests if plagiarized from valid sources, though this demonstrated

Movant's data were valid, *Infra*, Page A000017.  As the witness commented, "the data is not guilty". If we submit 60 bank

notes to an expert to be tested for forgery (fabrication) and he finds no evidence of forgery (fabrication), the expert does not

lose credibility if it is then shown the bank notes were stolen property (plagiarized) and not forged (fabricated).

(9) Movant wrote out what he agreed to as a plea agreement. He was presented with typed agreement documents as Court

reconvened and was advised by Counsel they were what he had agreed to and he should sign immediately. He was further

advised if he raised any questions at plea colloquy he would be sentenced to jail immediately. The documents were signed

April 24. He first received and could review a copy of the exclusion agreement May 21, *Infra*, Page A000015. He first

received and could review a copy of the plea agreement when he received it as an attachment to a letter from the American

Society of Nuclear Cardiology dated June 17, *Infra*, Page A000016. Most of the questions he has asked about the

agreements have yet to be answered

(b) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue? Yes " No "

(2) If you did not raise this issue in your direct appeal, briefly explain why:

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application? Yes " **No** "

(2) If your answer to Question (c)(1) is "Yes," state the type of motion, petition, or application, the name and location of the court where the motion or petition was filed, the case number (if you know), the date of the court's decision, and the result. Attach a copy of the court's opinion or order, if available.

(3) Did you receive a hearing on your motion, petition, or application? Yes " No "

(4) Did you appeal from the denial of your motion, petition, or application? Yes " No "

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal? Yes " No "

(6) If your answer to Question (c)(4) is "Yes," state the name and location of the court where the appeal was filed, the case number (if you know), the date of the court's decision, and the result. Attach a copy of the court's opinion or order, if available.

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," briefly explain:

**GROUND TWO: Claim of actual innocence.**

(a) Supporting facts (Do not argue or cite law. Just briefly state the facts that support your claim.):

(1) The sole specification of the indictment charges with respect to the soy study was that there were less than 60 participants when 60 were claimed. The sole evidence in support of this allegation was the opinion of Movant's employees, the Tarascio mother and daughter. The latter testified she was present less than half time and was not present Mondays and Fridays, nor after 3:00 pm Tuesday, Wednesday, Thursday, nor weekends.  Even recognizing that the research participants were volunteers, hence scheduled at their convenience and not always at regular office hours, Mrs. Tarascio was of the ostrich-like opinion that Movant could not have found and scheduled additional participants because she did not see them. She testified she was present through January 30, 2004 to do so. Movant repeatedly told counsel one reason Mrs. Tarascio did not see the additional participants was because Mrs. Tarascio was not there to see them. He repeatedly told Counsel Mrs. Tarascio had left his employ in mid-January, a few days after the study began.  To prove they were not present, he repeatedly urged Counsel to obtain and submit their pay roll records both  from his practice and from their subsequent employer. Counsel adamantly refused.

Subsequent to the trial Movant found ledgers and records from his CPA for the time in question. These records show the Tarascios were present substantially less than half of the time within which participants were present. Records for Mrs. Tarascio' show she received new employee notification that pay was biweekly with payment for each pay period at the end of the following pay period, *Infra*, Pages  A000018-A000020. The record additionally shows Mrs. Tarascio was not on the February 13 payroll which covered the January 17-30 pay period, *Infra*, Page A000021. Thus Mrs. Tarascio terminated her employment no later than January 16, 2004, with last pay check dated January 30, 2004, *Infra*, Page  A000022 . She falsely testified she was employed through January 30. Miss Tarascio was employed, as she testified, less than half-time,. The study plan was confirmed  January 7 with soy chip delivery  scheduled for January 12, enabling  first participant appointments no earlier than January 13, *Infra*, Pages A000023, A000024. Thus Mrs. Tarascio was present  for no more

than the first 4 days of the 25 days of initial intake to the study. She testified she observed and recorded the existence of 17

participants. That shows a recruitment and intake rate of about 4.25 participants a day. Completion of the study March 6

would have required the last recruited participant to begin February 6. Thus study initial testing ran from January 13 to

February 6, a total of 25 working days with an over all recruitment rate of 2.4 participants a working day. Mrs. Tarascio's

opinion that Movant could not have recruited the necessary participants to achieve 60 total is clearly false. Her observations

for the first 4 days clearly demonstrate the Movant could and did recruit and schedule at a rate  more than sufficient to

achieve a total of 60 participants in the time period available.

## Schedule Times Available for a Research Participant's First Appointment

| | | ☺ Mrs.Tarascio Present to See | | | | | | | | ● Mrs. Tarascio Not Present to See | | | | | | | | | |
| DATE | 8:00 | 8:30 | 9:00 | 9:30 | 10:00 | 10:30 | 11:00 | 11:30 | 12:00 | 12:30 | 1:00 | 1:30 | 2:00 | 2:30 | 3:00 | 3:30 | 4:00 | 4:30 | 5:00 | 5:30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| T Jan 13 | ☺ | ☺ | ☺ | ☺ | ☺ | ☺ | ☺ | ☺ | ● | ● | ☺ | ☺ | ☺ | ☺ | ☺ | ☺ | ☺ | ☺ | ● | ● |
| W Jan 14 | ☺ | ☺ | ☺ | ☺ | ☺ | ☺ | ☺ | ☺ | ● | ● | ☺ | ☺ | ☺ | ☺ | ☺ | ☺ | ☺ | ☺ | ● | ● |
| T Jan 15 | ☺ | ☺ | ☺ | ☺ | ☺ | ☺ | ☺ | ☺ | ● | ● | ☺ | ☺ | ☺ | ☺ | ☺ | ☺ | ☺ | ☺ | ● | ● |
| F Jan 16 | ☺ | ☺ | ☺ | ☺ | ☺ | ☺ | ☺ | ☺ | ● | ● | ☺ | ☺ | ☺ | ☺ | ☺ | ☺ | ☺ | ☺ | ● | ● |
| M Jan 19 | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| T Jan 20 | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| W Jan 21 | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| T Jan 22 | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| F Jan 23 | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| M Jan 26 | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| T Jan 27 | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| W Jan 28 | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| T Jan 29 | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| F Jan 30 | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| M Feb 2 | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| T Feb 3 | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| W Feb 4 | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| T Feb 5 | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| F Feb 6 | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |

Mrs. Tarascio's demonstrably false testimony and opinion is the sole basis for indictment counts 11, 12, and 13. Had

Counsel investigated and obtained and entered documentation, as urged by Movant, there would have been no basis for

indictment counts 11, 12, and 13.


(2)  The indictment alleged 10 counts of  fraud for billing under CPT Code 78465 for "claim forms for payment of

tomographic imaging studies which the defendant knew contained materially false and fraudulent information regarding

the quantity and type of imaging studies actually performed." and restates: "the claims submitted contained materially false and fraudulent pretenses and representations, and omissions of material fact, regarding the actual number and types of tomographic studies provided." Counsel did not investigate case law or Medicare requirements which demonstrate Movant could not have made such representations "regarding the actual number and types of tomographic studies provided" since Medicare claim forms and procedures provide no means for making such representations nor for submitting the facts allegedly omitted.

Counsel made no attempt to identify authorities on Medicare billing to be applied to the case. Historically, Social Security extended to Medicare billing required physicians submit written statements of services provided. Later Congress directed billing be digitized for electronic accounting. In compliance, Medicare ceased to accept physicians' descriptions and instead required numeric submissions based on choosing among a proprietary set of code numbers and associated descriptions. Actual descriptions were replaced by multiple choice selection among multiple descriptions on the basis of key words and Medicare rules. Accordingly accuracy of description was replaced by best choice among available alternatives.

Submission of a Medicare claim does not and cannot represent that the CPT Code used is an accurate description. It represents only that, among the codes available, the one reported most nearly matches the patient record on the criteria set forth by Medicare. Movant has not only used but promoted his planar image followed at a later time by a tomographic image protocol and so confessed. It was established at Trial that it is so recorded in his patient records as required for Medicare claims. The authoritative instructions are in the Medicare Manual, *Infra*, Pages A000025-A000028 :

"Use the ICD-9-CM code that is chiefly responsible for the item or service provided."

"The physician should code the ICD-9-CM code that provides the highest degree of accuracy and completeness." Of the code choices to be resolved only one can be used in any two day period. Since need for a tomographic image was "chiefly responsible" for the service, choice lies between 78464 (single image) and 78465 (multiple image) and is so specified in the indictment. Neither CPT description exactly fits a combination of a 2-dimensional image and a 3-

dimensional image taken at different times. The only key words that differentiate the choices in the CPT descriptions are

"single study" (78464) vis a vis "multiple studies" and "redistribution" (78465). A study entails a nuclear camera session.

Multiple studies entail more than one nuclear camera session. Since more was done than is covered by 78464 (single

study), 78465 (multiple studies and redistribution) better satisfies the Medicare "completeness" criterion in choosing

between the alternatives and better matches the key words "multiple studies" and "redistribution".

| Comparison of CPT Codes for "Greatest Degree of Accuracy and Completeness" Per Medicare Claims Processing Manual for Form CMS-1500 | |
|---|---|
| **CPT 78464** | **CPT 78465** |
| Myocardial perfusion imaging, tomographic (SPECT), **single study** | Myocardial perfusion imaging, tomographic (SPECT), **multiple studies**, |
| at rest or stress (exercise and/or pharmacologic), | at rest and/or stress (exercise and/or pharmacologic) and **redistribution** and/or rest injection, |
| with or without quantification | with or without quantification |

At no time did Counsel address the literal impossibility of the ten indictment charges of "fraudulent representations and

omissions of material fact regarding the actual number and types of tomographic studies provided." No Medicare billing

procedure requires, permits, nor provides any mechanism for either true or false claims of "the actual number and types of

tomographic studies provided". Medicare requires only and exclusively a best choice among CPT code numbers. The

charges in the present case do not specify a crime since it is not possible to perform the acts alleged.

(3) Had Counsel sought to find case law authorities an additional selection criterion beyond key words and "completeness"

could have been introduced. This is a billing case. While the descriptions are simply proprietary descriptions,

reimbursement rates are based on public regulatory actions. The choice of CPT code can be addressed by asking which

code most nearly meets the intent of the Government in expenditure of funds, that is, it can be considered as a financial and

billing question rather than as a medical practice question. Reimbursement rates are set by a formula. A major part of that

formula is overhead costs. SPECT cameras are high overhead. Acquiring two images at two different times requires

scheduling two different camera sessions Comparison requires both images use the same camera. There is also additional

physician and other personnel time entailed. Accordingly, basic costs to be reimbursed differ little, if at all, between one planar + one tomographic image and two tomographic images. Movant required two SPECT camera sessions with consequent multiple image overhead. Counsel failed to identify appropriate authorities and offer a reimbursement intent defense.

(4) Though the Court pointed out this was a billing fraud case and not a medical practice case, Counsel made no objections or other effort to gain exclusion of Prosecution medical practice testimony as irrelevant.

(5) Charges 1 through 10 allege "that the claims submitted contained materially false and fraudulent pretenses and representations, and omissions of material fact, regarding the actual number and types of tomographic studies provided." Necessity of acquiring a tomographic image was not disputed. Movant additionally acquired a planar image at an earlier time to gain additional diagnostic information from changes over time between the first image (planar) and the corresponding section of the second image (tomographic). Such changes are variously known as washin/washout and redistribution. Prosecution alleged the radioactive isotope used (Technetium Tc-99m sestamibi) "sticks" and does not redistribute so that no additional information is gained and Movant's protocol is simply a device to gain additional reimbursement fraudulently. The indictment charges allege a "device" with intent to defraud and this is the only prosecution claim of a possible device. Prosecution witnesses testified that there is no redistribution of the pharmaceutical used but cited no evidence. Movant provided Counsel with abstracts and full text articles of a selection of medical studies, published in peer reviewed international journals including abstracts published and disseminated by the National Library of Medicine, reporting such redistribution, *Infra*, Pages A000029-A000290. A sample of citations of these sources follows:

Eur J Nucl Med. 1995 Jan;22(1):49-55.
Washout and redistribution between immediate and two-hour myocardial
images using technetium-99m sestamibi.
Richter WS, Cordes M, Calder D, Eichstaedt H, Felix R.
Universitätsklinikum Rudolf Virchow, Freie Universität Berlin, Germany.

Eur J Nucl Med. 2000 Nov;27(11):1632-40.
A comparison of the overall first-pass kinetics of thallium-201 and
technetium-99m MIBI in normoxic and low-flow ischaemic myocardium.
Ayalew A, Marie PY, Menu P, Mertes PM, Hassan N, Danchin N, Olivier
P, Karcher G, Bertrand A.
Department of Nuclear Medicine, UPRES EA 2403, CHU-Nancy, France.

J Nucl Cardiol. 2001 Nov-Dec;8(6):677-86
Detection of myocardial viability in ischemic-reperfused rat hearts by Tc-99m sestamibi kinetics.
Liu Z Johnson G 3rd, Beju D Okada RD
William K. Warren Medical Research Institute of the University of Oklahoma Health Sciences Center,
Tulsa , USA. zliu@u.arizona.edu

J Nucl Med. 2001 Feb;42(2):272-81.
Kinetic analysis of 125I-iodorotenone as a deposited myocardial flow tracer: comparison with 99mTc-sestamibi.
Marshall RC, Powers-Risius P, Reutter BW, Taylor SE, VanBrocklin HF, Huesman RH, Budinger TF.
Center for Functional Imaging, E.O. Lawrence Berkeley National
Laboratory, University of California, Berkeley 94720, USA.

J Nucl Cardiol. 2001 Nov-Dec;8(6):677-86
Detection of myocardial viability in ischemic-reperfused rat hearts
by Tc-99m sestamibi kinetics.
Liu Z, Johnson G 3rd, Beju D, Okada RD.
William K. Warren Medical Research Institute of the University of
Oklahoma Health Sciences Center, Tulsa , USA. zliu@u.arizona.edu

Kaku Igaku. 2002 May;39(2):117-24.
[Rest delayed images on 99mTc-MIBI myocardial SPECT as a noninvasive
screen for the diagnosis of vasospastic angina pectoris]
[Article in Japanese]
Ono S, Yamaguchi H, Takayama S, Kurabe A, Heito T.
Department of Radiology, Yamagata Prefectural Shinjo Hospital.

Ann Nucl Med. 2002 Jun;16(4):237-42.
Assessment of myocardial washout of Tc-99m-sestamibi in patients
with chronic heart failure: comparison with normal control.
Kumita S, Seino Y, Cho K, Nakajo H, Toba M, Fukushima Y, Okamoto N,
Takano T, Kumazaki T.
Department of Radiology, Nippon Medical School, Tokyo, Japan.
s-kumita@nms.ac.jp

Q J Nucl Med Mol Imaging. 2005 Sep;49(3):281-5.
Washout of [99mTc] sestamibi in predicting response to chemotherapy
in patients with multiple myeloma.
Pace L, Catalano L, Del Vecchio S, De Renzo A, Fonti R, Salvatore B,
Andretta C, Di Nuzzo C, Rotoli B, Salvatore M.
Nuclear Medicine Unit, Department of Biomorphological and Functional
Sciences, Federico II University, Naples, Italy. pace@unina.it

J Nucl Cardiol. 2006 Jan-Feb;13(1):64-8.
Usefulness of Tc-99m methoxyisobutylisonitrile scintigraphy for
evaluating congestive heart failure.
Sugiura T, Takase H, Toriyama T, Goto T, Ueda R, Dohi Y.
Department of Internal Medicine, Enshu General Hospital, Hamamatsu,
and Department of Internal Medicine and Molecular Science, Graduate
School of Medical Sciences, Nagoya City University, Japan.

Ann Nucl Med. 2006 Jun;20(5):349-56

Clinical implication of reverse redistribution on 99mTc-sestamibi
 images for evaluating ischemic heart disease.
Tanaka R, Nakamura T, Chiba S, Ono T, Yoshitani T, Miyamoto A,
 Yamazaki J.
Radiological Department, Kushiro-shi Ishikai Hospital, Hokkaido,
 Japan. r_tanaka@kushiro-ishikai.or.jp

J Nucl Cardiol. 2006 Nov;13(6):779-90.
Organ biodistribution and myocardial uptake, washout, and
 redistribution kinetics of Tc-99m N-DBODC5 when injected during
 vasodilator stress in canine models of coronary stenoses.
Hatada K, Ruiz M, Riou LM, Lima RL, Goode AR, Watson DD, Beller GA,
 Glover DK.
Second Department of Internal Medicine, Cardiovascular Division,
 Kansai Medical University Takii Hospital Moriguchi City, Osaka, Japan.

Nucl Med Biol. 2007 Jan;34(1):109-16.
Mitochondrial avid radioprobes. Preparation and evaluation of
 7'(Z)-[125I]iodorotenone and 7'(Z)-[125I]iodorotenol.
VanBrocklin HF, Hanrahan SM, Enas JD, Nandanan E, O'Neil JP.
Department of Functional Imaging, Lawrence Berkeley National
 Laboratory, Berkeley, CA 94720, USA. hfvanbrocklin@lbl.gov

Ann Nucl Med. 2007 Jul;21(5):267-73.
Myocardial kinetics of (201)Thallium, (99m)Tc-tetrofosmin, and
 (99m)Tc-sestamibi in an acute ischemia-reperfusion model using isolated
 rat heart.
Fukushima K, Momose M, Kondo C, Kusakabe K, Kasanuki H.
Department of Cardiology, Tokyo Women's Medical University, Tokyo,
 Japan.

J Nucl Cardiol. 1998 Mar-Apr;5(2):202-5.
Prediction of functional recovery in acute myocardial infarction:
 comparison between sestamibi reverse redistribution and sestamibi/BMIPP
 mismatch.
Fujiwara S, Takeishi Y, Atsumi H, Yamaki M, Takahashi N, Yamaoka M,
 Tojo T, Tomoike H.
First Department of Internal Medicine, Yamagata University School of
 Medicine, Iida-Nishi, Japan. sfujiwar@med.id.yamagata-u.ac.jp

Ann Nucl Med. 2005 Jul;19(5):387-92. Related Articles
Relation between Tc-99m sestamibi uptake and biological factors in
 hyperparathyroidism.
Cermik TF, Puyan FO, Sezer A, Firat MF, Berkarda S
 Department of Nuclear Medicine, School of Medicine, Trakya
 University, Edirne, Turkey. cermik@trakya.edu.tr

 Ann Nucl Med. 2006 Dec;20(10):663-70.
 Myocardial uptake characteristics of three 99mTc-labeled tracers
 for myocardial perfusion imaging one hour after rest injection.
 Manka-Waluch A, Palmedo H, Reinhardt MJ, Joe AY, Manka C, Guhlke S, Biersack HJ, Bucerius J
 Department of Nuclear Medicine, University of Bonn, Bonn; Germany.

Nucl Med Biol. 2007 Jan;34(1):109-16.
Mitochondrial avid radioprobes. Preparation and evaluation of
 7'(Z)-[125I]iodorotenone and 7'(Z)-[125I]iodorotenol.
VanBrocklin HF, Hanrahan SM, Enas JD, Nandanan E, O'Neil JP
Department of Functional Imaging, Lawrence Berkeley National
 Laboratory, Berkeley, CA 94720, USA. hfvanbrocklin@lbl.gov

Nuklearmedizin. 1999;38(6):189-91. Myocardial uptake of technetium-99m-furifosmin (Q12) versus technetium-99m-sestamibi (MIBI).
Bangard M, Bender H, Grünwald F, Hümmelgen M, Willkomm P, Palmedo H, Lüderitz B, Biersack HJ
Klinik für Nuklearmedizin, Universitätsklinik Bonn, Deutschland.
bangard@mailer.meb.uni-bonn.de

Kaku Igaku. 1991 Oct;28(10):1133-42
[Phase I clinical study on 99mTc-MIBI]
[Article in Japanese]
Kubo A, Nakamura K, Sanmiya T, Shimizu S, Hashimoto S, Iwanaga S, Handa S, Torizuka K
Department of Radiology, Keio University Hospital, Tokyo.

Eur J Nucl Med. 1990;16(8-10):705-11.
Segmental analysis of SPECT 99mTc-methoxy isobutyl isonitrile and
201Tl myocardial imaging in ischaemic heart disease
Hassan IM, Mohammed MM, Constantinides C, Sadek S, Nair M, Belani N, Yousef AM, Abdel-Dayem HM
Department of Nuclear Medicine, Kuwait University.

J Nucl Cardiol. 2007 Apr;14(2):215-20.
A novel clinical indicator using Tc-99m sestamibi for evaluating
cardiac mitochondrial function in patients with cardiomyopathies.
Matsuo S, Nakae I, Tsutamoto T, Okamoto N, Horie M.
Department of Cardiovascular and Respiratory Medicine, Shiga
University of Medical Science, Shiga, Japan. smatsuo@belle.shiga-med.ac.jp

When Counsel began to present these to the principal Prosecution witness, Dr. McKusik, Dr. McKusick

dismissed them as being without merit because of the race or national origin (Japanese) of some of the

sources. The radioactive pharmaceutical sources are limited and international so that there are no

differences in race or national origin of the pharmaceuticals. There is no credible evidence Japanese

researchers are generically incompetent in use of electronic cameras, imaging devices, and

instrumentation. The witness discriminated against the researchers on the basis of race or national origin

extending that discrimination by association solely through their common interest in

washin/washout/redistribution. Counsel acceded to this view and did not submit the scientific medical

literature on which Movant's diagnostic procedures were built. Thus, Counsel's actions were equally

discriminatory against the researchers and Movant. The principal scientific exculpatory evidence

justifying the imaging protocols was not submitted in an act of discrimination on the basis of race or

national origin. It was a further act of discrimination to reject the work of white researchers, including

Movant on the basis of their association with the Japanese researchers through only the flimsiest of

connections, a common interest in the same scientific phenomena.

Had Counsel submitted the documentation it would have been irrefutable proof the planar+ tomographic procedures were based on peer-reviewed science and provided diagnostic information not otherwise available. This would have left no avenue for claim the procedures were simply "devices" for fraudulent billing. No basis would have remained for charges 1-10.

(6) Counsel failed to follow up prosecution witness testimony Movant's imaging procedures were motivated by the intent to do research. This prosecution witness testimony that Movant's procedures were research, thus not a device to defraud Medicare, was contrary to and a denial of the charges of the indictment.

(7) Prosecution testimony that Movant's procedures were "experimental" are a charge not specified in the indictment and should have been resisted. There is a an "experimental"/"investigational" exclusion for Medicare reimbursement but in 1995 the exclusion became a case-by-case matter for expert hearing. There was no attempt to gain such fair hearing on its applicability here.

(8) "Experimental" usually refers to absence of any published peer-reviewed research. Some national health plans and some private insurers ask more and specify two peer-reviewed publications as establishing a procedure as standard and specify a standard journal list such as the National Library of Medicine Medline or the International Council of Medical Journal Editors. Movant provided Counsel with a number of such publications underlying his procedure but Counsel failed to present them, *Infra*, Pages A000029-A000290.

(9) Medicare rules do not permit billing for support of research but indictment charges were not for improper research costs. Had research costs been at issue, NIH and VA Research Manuals could have been introduced to show the billings were proper with respect to research exclusions.

(10) Agent Palmer asserted that sestamibi sticks so there is no difference between an image taken at "two minutes and one taken at two hours" (Movant's protocol was five minutes and one hour). Other Prosecution witnesses took a similar position. Movant asked Counsel to test Prosecution witnesses testimony that no changes occurred between the two imaging sessions by presenting the comparable images as a group and having the witnesses match the presumed identical images. He did not do so.

(11) Further on the testimony of no difference, Movant asked that the images, *Infra*, Pages A000291-A000308, be presented to the jury and the comparisons pointed out so they could see for themselves that there were changes. Counsel did not do so.

(12) Most of the above Medicare issues are medical practice charges raised by the Prosecution and do not address the indictment charges. Since not specified in the indictment heir relevance is questionable but they are presented herein in compliance with the 2255 instructions to cover all issues. The medical practice non-indicted charges led the Court to believe the diagnostic methods were neither intended to provide nor did they provide medical value. The fact is that redistribution is a standard diagnostic method incorporated into CPT Code 78465. It requires  taking two images (multiple images) at two imaging sessions, separated in time, using a single sestamibi injection and the same nuclear camera at both sessions.  CPT code 78464 does not include redistribution in its descriptor. The procedure and intent were redistribution diagnosis and thus the basis for billing under CPT 78465. In fact the first study in nuclear cardiology was of changes in blood flow which we now refer to as redistribution when examining the heart (Blumgart & Yens, *Journal of Clinical Investigation*, Vol. 4, No. 1, 1927). It is

identified in histories of medicine as the genesis of the field. Prosecution did offer witnesses who believed the specific radioactive pharmaceutical used (sestamibi), unlike its predecessors, did not redistribute but they cited no evidence. The scientific literature Movant provided, but Counsel did not submit, shows that it does redistribute as do other radioactive pharmaceuticals..

(13) At the beginning of representation by Counsel in this case, the Magistrate Judge found of Movant:

> He has been admitted to practice privileges in numerous clinics, institutes, and hospitals. He has received many awards and recognitions, and has been on the adjunct teaching faculty at the University of Nebraska Medical Center. He has written numerous articles, six chapters of others' medical texts, and three books. He is widely published in medical journals.

However, Counsel presented the case in such a manner as to bias and to create, among the jury and others, a false and misleading impression of Movant's reputation, professional competence, probity, and contribution to society. Jury survey demonstrated this negative view was indeed the effect. From the Trial record created, the Probation Office Pre-sentence Report drew the conclusion Movant had committed such extreme malpractice that he should be barred from the practice of medicine for life. Counsel rejected Movant's proposal that his curriculum vitae, *Infra*, Pages A000309-A000354, be submitted to show that he enjoyed some stature in his field, that he actively contributes to the advancement of medical science and practice, that he has represented the United States at international medical meetings, that he is a medical consultant to ABC and has appeared on network television, and that he has actively promoted the use of the Trial cited planar+tomographic imaging protocol as potentially saving 40,000-60,00 American lives a year. Similarly, Counsel halted testimony of Dr. Nagel when he suggested Movant's stature in the field was not being recognized at Trial.

(14) There is no evidence Movant's procedures were intended to defraud. On the contrary, Movant's publication record shows his current implementation of the redistribution procedure which now uses computer comparison (quantification in the CPT 78465 descriptor) of the two images may become a

new standard for nuclear cardiology and that his intent in promoting usage has been to save lives, not to defraud, *Infra*, Pages A000075-A000079. Counsel's acquiescence to the prosecution's acceptance of unsubstantiated opinions, rather than peer-reviewed medical publications promoted presumption of guilt over the evidence of innocence.

(15) Counsel was not effective with statistical analysis presentation. Movant consulted Professor Gordon Harrington, now retired, who had been Distinguished Scholar and Movant's teacher at the University of Northern Iowa, and Movant's statistical consultant since. Dr. Harrington commented it is extremely difficult to fabricate data undetectably and explained why it is so difficult. He analyzed the soy data with several tests used in industrial quality control, concluding there was no evidence of some of the data being fabricated. Counsel strongly opposed using Dr. Harrington as a witness advising that the Prosecution would "tear him apart" and the Judge was strongly biased against statistics. Counsel averred he could fabricate data readily and undetectably. He corresponded with Dr. Harrington, indicated he was fully aware of quality control concepts, and would set about to make up a FakeData set to be tested in the same way the Fleming data had been validated. At Trial he described this data set as one provided only to Movant. Only later did Counsel report he had discovered, through review of e-mails, that a copy had also been sent to Gordon Harrington, identified only as a friend of Movant. Movant was not privy to the Harrington-Counsel interchange and obtained information since trial. Dr. Harrington notes the indictment was for fabrication and the law identifies three different forms of health research data fraud: fabrication, falsification, and plagiarism. He concludes:

> Using well established methods I made multiple **fabrication** tests of your data. There was no evidence of **fabrication**. Drs. Carriquiry and Kaiser used complex methods for detecting **fabrication** recommended by the Government agency responsible for developing such methods and for overseeing their use in PHS agencies. They found no evidence of **fabrication**. I found the Hansen data were **plagiarized**, as later confirmed in Court. I found the Hansen data to be **falsified**, as later confirmed in Court. The law establishes three forms of data fraud: **fabrication, falsification,** and **plagiarism.** You were charged with **fabrication** and all the tests show there was no **fabrication**, *Infra*, Page A000355-A000380

Proof of plagiarism requires comparison with the source. A statistical test verified substantial basis in the Fleming data. Putting the mathematical statistical significance test into layman's terms: the chances that the Hansen data were arrived at independently rather than being plagiarized from Movant's data are of the same order of magnitude as the chances one of the jurors will die in an automobile accident in the next 24 hours.

(i) Dr. Harrington's quality control analytic method for the Fleming data showed no evidence of fabricated data. (ii) Using Office of Research Integrity (ORI) developed and recommended methods, Drs. Kaiser's and Carriquiry's very different analytic method for the Fleming data showed no evidence of fabricated data, *Infra*, Pages A000458-A000498. (iii) Dr. Harrington's analytic method for the FakeData showed no evidence of fabricated data. (iv) Dr. Kaiser's draft of the Kaiser/Carriquiry report using ORI methods for the FakeData showed no evidence of fabricated data, *Infra*, Pages A000499-A000545. Since the FakeData are plagiarized, tests on the FakeData are alternative tests of the validity of the source data. Hence the FakeData test results are exculpatory since they provide additional evidence their source, the Fleming data, is valid. Counsel knew the source and should have developed that fact.

The evidence was that the FakeData were not fabricated but plagiarized from a source that was not fabricated, namely, Movant's data. There were therefore 60 participants in the research and no fabrication as charged in the indictment. However, Counsel abandoned that defense, which encouraged the jury to conclude that if Counsel plagiarized data then Movant must have been guilty of plagiarism. Counsel did not address the fact this was a new charge requiring the forms of evidence required to demonstrate plagiarism or copyright infringement. Further, Counsel refused Movant's request that

available evidence provided by Movant be introduced showing that plagiarism required comparison with sources and there was adequate evidence to believe no such sources existed.

(16) Counsel's handling of the Dr, Carriquiry's statistical testimony was not in the best interests of Movant. The indictment charged "some of the data was fabricated because the clinical study did not have 60 participants." Dr. Harrington tested the soy data to ask whether some, but not all, of the data were fabricated. He made multiple tests using methods that have been fundamental to industrial quality control for over three-quarters of a century to determine whether any new or different factors have entered into the production process. None of his tests showed any evidence of fabrication. Counsel advised he could fabricate data and that it could not be detected. He challenged Dr. Harrington to demonstrate he could detect falsification of a data set comparable to Movant's in which earlier data were true and later data false. Dr. Harrington applied the same methods and found evidence of falsification and of plagiarism but none of fabrication. Counsel had submitted a data set falsely represented to be fabricated knowing full well that it was not what it was represented to be. These data subsequently were submitted to Drs. Carriquiry and Kaiser who applied methods utilized by the Office of Research Integrity to test for any evidence of fabrication, partial or total. They reported no evidence of fabrication in either Movant's or Counsel's data. These statisticians were so surprised Counsel's data did not test as fabricated as to suggest a write-up be submitted to a professional journal. This publication implication has substantial significance. The test methods followed the methods and recommendations of the Office of Research Integrity. The ORI is charged by Congress to develop and promulgate methods to assess research integrity and to educate and advise on research integrity. It further has investigative supervisory authority over investigation of research data fraud where Public Health Service funds are involved. If the Government's methods of determining data fraud in health care are seriously flawed, it would throw into question much of what the Government has done in the prosecution of research fraud. Counsel did not serve the interests of his client when it came out that

Counsel's data were plagiarized from Movant's data. Drs. Carriquiry and Kaiser had been informed

those data had been fabricated. They had no reason not to believe and every reason to believe Counsel

had spoken the truth. As Dr. Carriquiry responded at trial, if the data are plagiarized it is not the data

which are lying if they test as not fabricated. Counsel abandoned his examination of her leaving the

impression with many in the court she had changed her position that Movant's data were not fabricated.

In fact she testified it would be easy to pass a fabrication test if the plagiarized data are not fabricated.

Movant was charged with fabrication, not plagiarism, and the data test as valid using Government

recommended test procedures .

(b) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue? Yes " No "

(2) If you did not raise this issue in your direct appeal, briefly explain why:

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application? Yes " **No** "

(2) If your answer to Question (c)(1) is "Yes," state the type of motion, petition, or application, the name and location of the court where the motion or petition was filed, the case number (if you know), the date of the court's decision, and the result. Attach a copy of the court's opinion or order, if available.

(3) Did you receive a hearing on your motion, petition, or application? Yes " No "

(4) Did you appeal from the denial of your motion, petition, or application? Yes " No "

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal? Yes " No "

(6) If your answer to Question (c)(4) is "Yes," state the name and location of the court where the appeal was filed, the case number (if you know), the date of the court's decision, and the result. Attach a copy of the court's opinion or order, if available.

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," briefly explain:

**GROUND THREE:** Conviction obtained by use of coerced confession.

(a) Supporting facts (Do not argue or cite law. Just briefly state the facts that support your claim.):

(1) Prior to 2007 Movant had private attorneys who answered a succession of charges from the Prosecutor as newer charges successively replaced older charges when they were answered. Movant exhausted his funds on this representation at which point the attorneys ceased to answer and Prosecution obtained an indictment on the unanswered charges. The private attorneys advised him the case would be simple to try since he was clearly innocent on the Medicare counts and basing charges on testimony of not having witnessed something was ridiculous. However, after indictment and appointment of a Public Defender , Movant has felt under continuing pressure from Counsel to enter into a plea deal or go to jail, *Infra*, Pages A000381-A000406 , while seeing little in the way of defense of innocence as an alternative Counsel would pursue.

(2) The soy case was essentially a case of statistics.. Counsel advised Movant the Judge detested statistics so there was no prospect of judicial neutrality on statistical evidence, *Infra*, Page A000407. Hence, jail could only be avoided by a plea deal.

(3) During jury deliberations Counsel advised he believed the jury would find Movant guilty and advised a plea deal, if he wished to stay out of jail! Movant wrote out by hand what he was willing to plea. Following recess as the Judge returned to the bench, Counsel presented a document telling Movant it was the typed version of his plea and directing him to sign before the Call to Order. There was no opportunity to read the document and Movant did not learn the terms of the plea agreement until some time later when he received a letter from a medical society indicating his membership was being terminated and enclosing a copy of the plea deal by way of explanation, *Infra*, Page A000016 .

(4) After reading the plea agreements Movant addressed many questions of meanings and implications to Counsel, *Infra*, Pages A000408-A000454, few of which were answered.

(5) When Movant expressed reservations and asked about answering the Court's questions at sentencing, he was advised that any answer which might throw the plea deal in question would result in the Court rejecting the plea deal and an immediate sentence to jail.

(6) When Movant found the exculpatory evidence of pay roll records, *Supra*, Pages 9-10, and asked about presenting the evidence to the Court, Counsel advised on May 5, "you need to see a mental health professional" (*Infra*, Page A000005 ), emphasizing it was "legal advice" and that attempting to introduce the exculpatory evidence would result in the Court rejecting the plea deal and an immediate sentence to jail.

(7)  Subsections (2)-(6), *Supra*, left Movant with feelings of extreme coercion on the part of Counsel  and, since so advised by Counsel,  of extreme coercion by the Court.

(8) Personal circumstances also contributed to the feelings of  coercion. Movant felt above all else he had to be free to care for his youngest son. A continuing domestic relations dispute is in the Nebraska State courts,  Sarpy County, Cl05-1613 . Movant's former wife  was arrested for child abuse and ordered to counseling. Movant's son successfully petitioned for paternal custody for which paternal liberty is a necessity.  The needs of the son are the dominant factor in Movant's decisions about pleas.

(9) An additional coercive factor was the Prosecution's role in the domestic relations dispute, *Ibid.* The child refers to almost daily contact between his mother and an "FBI agent called Kathy"  who was  providing government investigative services and reports on Movant's activities, travels, socialization with members of the opposite sex. His mother would tell him his father was going to jail. This involvement and support of the Prosecution for the domestic relations dispute was confirmed by testimony of Movant's former wife in Sarpy County, Nebraska, District Court, September 6, 2007. Movant felt the Prosecution was threatening the welfare of his child  in providing his former wife with Federal support in domestic

relations litigation and would cease only if Movant accepted a plea deal closing the Federal interest.

(10) It was planned that coding expert Kristi Gutierriz of the University of Nevada-Reno would testify 78465 was the proper billing code. Following her interview with Prosecution, the University Attorney came to her and directed her not to testify. For over a thousand years it has been the purpose of universities to assemble *collegia magistri* and make their knowledge available for the public good. For this reason it is commonplace for university staff to advise and provide testimony in the judicial system. It seems inconceivable that a university would restrict the dissemination of knowledge unless coerced to do so by external parties. The testimony was not so unique as to become a target of suppression. Rather, it seemed to Movant clear such coercion came from Prosecution and was intended to pressure him into the plea deal proposed by Prosecution.

(11) At the VA Hospital in Reno Movant had every reason to believe his services were well regarded. He was under consideration for ACOS for Research and a faculty appointment for cardiology liaison with the hospital. Without warning or explanation he was peremptorily dismissed. Movant can think of no explanation other than interference by Prosecution to limit his alternatives. It seemed to Movant clear such coercion came from Prosecution limiting his choices.

(b) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, **did you raise this issue?** Yes " No "

(2) If you did not raise this issue in your direct appeal, briefly explain why:

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application? Yes " **No** "

(2) If your answer to Question (c)(1) is "Yes," state the type of motion, petition, or application, the name and location of the court where the motion or petition was filed, the case number (if you know), the date of the court's decision, and the result. Attach a copy of the court's opinion or order, if available.

(3) Did you receive a hearing on your motion, petition, or application? Yes " No "

(4) Did you appeal from the denial of your motion, petition, or application? Yes " No "

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal? Yes " No "

(6) If your answer to Question (c)(4) is "Yes," state the name and location of the court where the appeal was filed, the case number (if you know), the date of the court's decision, and the result. Attach a copy of the court's opinion or order, if available.

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," briefly explain:

**GROUND FOUR:** Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant

(a) Supporting facts (Do not argue or cite law. Just briefly state the facts that support your claim.):

(1) At the time of the early pre-grand jury investigation of this matter, Movant was represented by Byam & Hoarty. Prosecution had in its possession a pre-grand jury response, by this law firm, to a subpoena for Movant's research records. That letter notes the information and advice that Movant's signature on the document of Charge 13, on which he was convicted, was only an acknowledgement of receipt and not an affirmation of the content, *Infra*, Pages A000455-A000457.

(2) With respect to the remaining records the Prosecution was informed, by Byam & Hoarty, which records were then in the possession of Revival Soy and which were in the possession of the State of Nebraska. Either the Prosecution continued its efforts and obtained the records without making them available to Movant or found reason not to pursue the matter further without revealing to Movant its basis for no longer considering the records relevant.

(3) Prosecution introduced the Kaiser statistical report at Trial and informed the Court the report was obtained from the Office of Research Integrity when the ORI was contacted for advice. Prosecution did not reveal the advice received. The ORI web site indicates ORI provides written advice to institutions and telephone advice to individuals. The ORI provides research and education on research data integrity methods to government and public in general as well as having investigative authority for research fraud in PHS funded research. Telephone response to Movant from ORI (ann.hohmann@hhs.gov) that the Kaiser/Carriquiry report was "top notch" left some expectation that Prosecution would have received advice favorable to Movant.

(b) **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue? Yes " No "

(2) If you did not raise this issue in your direct appeal, briefly explain why:

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application? Yes " **No** "

(2) If your answer to Question (c)(1) is "Yes," state the type of motion, petition, or application, the name and location of the court where the motion or petition was filed, the case number (if you know), the date of the court's decision, and the result. Attach a copy of the court's opinion or order, if available.

(3) Did you receive a hearing on your motion, petition, or application? Yes " No "

(4) Did you appeal from the denial of your motion, petition, or application?

Yes " No "

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal? Yes " No "

(6) If your answer to Question (c)(4) is "Yes," state the name and location of the court where the appeal was filed, the case number (if you know), the date of the court's decision, and the result. Attach a copy of the court's opinion or order, if available.

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," briefly explain:

13. Is there any ground in this motion that has not been presented in some federal court? If so, which ground or grounds have not been presented, and briefly state your reasons for not presenting them: **This is the first presentation**.

14. Do you have any motion, petition, or appeal now pending (filed and not decided yet) in any court for the judgment you are challenging? Yes " No " If "Yes," state the name and location of the court, the case number, the type of proceeding, and the issues raised. **No**

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: **Michael Hansen, Public Defender Office, Lincoln. Nebraska**

(b) At arraignment and plea: **Same**

(c) At trial: **Same**

(d) At sentencing: **Same**

(e) On appeal: **NA**

(f) In any post-conviction proceeding: **None**

(g) On appeal from any ruling against you in a post-conviction proceeding:

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time? Yes " No "

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging? Yes " No "

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future? Yes " No "

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as codified in 28 U.S.C. § 2255 does not bar your motion.*

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as codified in 28 U.S.C. § 2255, paragraph 6, provides in part that: A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of —

(1) the date on which the judgment of conviction became final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Therefore, movant asks that the Court grant the relief to which he or she may be entitled.

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion Under 28 U.S.C. § 2255 was placed in the prison mailing system on (month, date, year). **US Postal Service, 9/9 /2009 Certified Mail: 7009 0820 0002 2438 6382**

Executed (signed) on (date). **9/1/2009**

Signature of Movant (required)

\* \* \* \* \*

**Model Form for Use in 28 U.S.C. § 2255 Cases Involving a Rule 9 Issue (Abrogated)**

# ATTACHMENTS

# Appendix

# (545 pages)

# A000001 to A000545



U.S. POSTAGE
PAID
RENO, NV
89523
SEP 09
AMOUNT
$16.75
00063354-09

68508
1004

UNITED STATES
POSTAL SERVICE

88TPOFBWBF 19

RNO -> FX    SC    OMA

685

TOTAL: 000240
ORG:RNO:X09

7009 0820 0002 2448 6382

CERTIFIED MAIL

Large Flat F
For Domestic and

PRIORITY®
MAIL
UNITED STATES POSTAL SERVICE

For Domestic
and International Use

From  Rm Fleming, MD
6850 Sharlands Ave, A2201
Reno, NV 89523

TO   Clerk of Court
100 Centennial Mall N, Ste ST3
Lincoln, NE 68508

Label 228, January 2008

arge Flat Rate
r Domestic and International

sit us at usps.com

TERNATIONAL RESTRICTIONS A

0-POUND WEIGHT LIMIT
N INTERNATIONAL APPLIES

...oms forms are required.
...sult the International Mail Manual (IMM).
...pe.usps.gov or ask a retail associate
...details.